# STATE OF CONNECTICUT *v.* VICTOR O.*
## (SC 17983)

Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan and Eveleigh, Js.

---

* In accordance with the policy of protecting the privacy interests of victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See *General Statutes* § 54-86e.

Argued December 6, 2010—officially released June 7, 2011

*Elizabeth M. Inkster*, senior assistant public defender, with whom, on the brief, was *Kent Drager*, former senior assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Paul J. Ferencek* and *Maureen Ornousky*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Victor O., guilty of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), and two counts of risk of injury to a child in violation of General Statutes (Rev. to 2001) § 53-21 (a) (2), as amended by Public Acts 2002, No. 02-138, § 4, arising out of the defendant's sexual abuse of C, the son of the defendant's wife.[1] The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a term of thirty years imprisonment, execution suspended after fifteen years, and twenty years of probation. On appeal,[2] the defendant claims that the

[1] C was nine years old at the time of the alleged abuse. C's mother was the defendant's wife at the time of the alleged abuse but is no longer married to the defendant.

[2] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-4.

trial court improperly (1) excluded expert scientific testimony that he contends was relevant to show his lack of sexual interest in prepubescent males, (2) excluded evidence that C's mother had viewed pornographic and adult dating websites on the family computer, (3) permitted the state to elicit testimony from its expert regarding the purpose of forensic interviews of child abuse victims, and (4) allowed the state to refer to C as the "victim" in the jury's presence. The defendant also claims that he was deprived of his right to a fair trial as a result of numerous instances of prosecutorial impropriety during closing argument and, finally, that the trial court improperly sentenced him to a term of probation rather than to a term of special parole in connection with his conviction of first degree sexual assault. Although we agree that the trial court imposed an improper sentence in connection with the defendant's conviction of first degree sexual assault and reverse the trial court's judgment with respect to that sentence, we reject the defendant's other claims and, accordingly, affirm the trial court's judgment in all other respects.

The jury reasonably could have found the following facts. The defendant married C's mother in September, 2000, when C was six years old. The couple subsequently had a daughter together, C's half sister, who was born in June, 2002. At that time, the family was living in an apartment in the town of Greenwich. In December, 2002, however, they purchased a home in the town of Shelton. The night before they were scheduled to move, C's mother stayed in the Greenwich apartment so that she could supervise the movers the next day, and C spent the night alone with the defendant in the Shelton residence. That evening, while C was watching television, the defendant touched C's "private parts" with his hands and put "his penis in [C's] butt" but did not ejaculate. C, who was nine years old at the

time, did not tell his mother what the defendant had done because he was afraid and embarrassed.

Additional incidents of sexual abuse and misconduct occurred after the move to Shelton. On several occasions, the defendant touched C in an inappropriate manner and showed him pornographic images on the family computer from a certain pornographic website (website X). On one occasion, the defendant called C into a room, masturbated and ejaculated in C's presence. On two other occasions, the defendant showed C a "dildo" sex toy that the defendant had purchased online. On at least one occasion, the defendant asked C to hold it; when C refused, the defendant penetrated his own anus with it in C's presence.

In February, 2003, C told his mother for the first time that the defendant had touched him inappropriately. C's mother immediately confronted the defendant, who claimed that he and C "were just fooling around" and that any touching that might have occurred was unintentional or had been misunderstood by C. That night, C slept with his mother in her bedroom while the defendant slept downstairs. The next morning, C left to spend the weekend with his biological father. While he was gone, the defendant continued to sleep downstairs. During the course of the weekend, C's mother told the defendant that she did not understand why C would say what he had said about the defendant if it were not true. The defendant replied that he and C "must have been wrestling and fooling around, and, maybe, I accidentally touched him."

The following week, C's mother called the defendant at work and told him that she wanted him to move out of the house because she was uncomfortable with him being around C. The defendant agreed and later returned home to pick up some of his belongings. Over the next few days, C's mother and the defendant spoke

several times on the telephone. During those conversations, the defendant insisted that he and C only had been "fooling around," that C "might have taken something the wrong way," and that he "could have touched [C] by accident." Five days after the defendant left the house, C's mother relented and allowed the defendant to return home. At that time, she, the defendant and C held a family meeting at which the defendant told C "that he loved him [that] he would never hurt him and [that] . . . he cared very much about [him] . . . ." During that meeting, C sat with his head down and said nothing. The incidents of abuse resumed shortly thereafter, but C did not report them to his mother.

Several months later, on September 26, 2003, C was sitting on the defendant's lap in front of the family computer, looking at photographs of dogs to adopt, when the defendant placed his hand inside C's pants and began to touch C's penis. While this was happening, C's mother walked into the room, saw the defendant with his hand in C's pants and exclaimed, "what are you doing?" The defendant replied, "nothing." She then turned to C and asked him whether the defendant had been touching him, to which C replied, with a scared look on his face, "no." When C's mother began yelling at the defendant, the defendant left the room and went outside to smoke a cigarette. While the defendant was outside, C's mother again asked C whether the defendant had been touching him. C answered "yes" and stated that the defendant had "been doing it for a long time." C's mother then went upstairs and locked the defendant out of the house. Twenty minutes later, however, she allowed him to reenter, but only to gather his belongings and to leave, which he did. The defendant never returned to live with C and his mother, and he and C's mother divorced soon thereafter.

At trial, the defendant testified that he never had touched C inappropriately or shown him pornography

on the Internet. He also denied that C's mother ever had confronted him about inappropriate sexual conduct toward C before the defendant and C's mother permanently separated. He claimed that, contrary to the testimony of C's mother, he had moved out of the family residence for five days in February, 2003, as a result of marital problems unrelated to C. He also claimed that he had left the house on September 26, 2003, not because C's mother had seen him with his hand inside C's pants but, rather, because she became furious with him over his plans to adopt a dog. The defendant testified that his relationship with C's mother had deteriorated after their move to Shelton, that she had grown unhappy with his long work hours and the fact that he spent more time with his daughter than with C. During closing argument to the jury, defense counsel argued that C's mother had fabricated the allegations of sexual abuse simply as a way of ending her marriage to the defendant. Ultimately, the jury was not persuaded by these claims and found the defendant guilty of one count of sexual assault in the first degree and one count of risk of injury to a child in connection with the defendant's sexual assault of C on the night that he and C had stayed alone in Shelton. The jury also found the defendant guilty of one count of risk of injury to a child in connection with the incident in which C's mother discovered the defendant with his hand inside C's pants. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court abused its discretion in excluding expert testimony regarding psychological testing that had been performed on him, in particular, the Abel Assessment of Sexual Interest (Abel test), which indicated that, at the time of testing, the defendant had no sexual interest in males or prepu-

bescent males.[3] Specifically, the defendant contends that the trial court improperly concluded that the results of the Abel test were not relevant to his motive to commit the charged offenses and were not sufficiently reliable to satisfy the standard for the admission of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and adopted by this court in *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

Prior to the commencement of trial, the state filed a motion in limine to exclude evidence and testimony about a sexual evaluation report, prepared by Andrew Kass, a clinical psychologist, in which Kass concluded, on the basis of the Abel test, that the defendant lacked a sexual interest in prepubescent males. In support of its motion, the state maintained that the conclusions of the report were not relevant to the charged offenses and that the Abel test is not a scientifically valid tool for diagnosing the absence of sexual interest in children.

At an evidentiary hearing on the state's motion, Kass, whose credentials as an expert were not challenged, testified about the Abel test as follows: "Essentially, the Abel . . . test is a visual reaction time test. We show the individual a number of slides, of pictures of men and women, boys and girls, of different ages and in different situations. The images are all clothed and considered appropriate and not obscene. We ask the individual to look at each of these slides on the slide projector . . . [and] to rate them in terms of how sexu-

---

[3] Two other tests, namely, the Bumby Cognitive Distortions Scale and the Abel and Becker Cognition Scale, were performed on the defendant for purposes of his sexual evaluation. These tests are used to help verify the results of the Abel test. For purposes of this appeal, however, they have no significance independent of the Abel test. Accordingly, we refer only to the Abel test.

ally arousing or disgusting the thought of engaging in sexual behavior with the person . . . in that image is." Kass also testified that the Abel test is based on "the notion that we tend to look at images of people longer that we like or we find attractive than we would look at something that we [do] not like or [do] not find attractive. The test . . . measur[es] . . . how long a person views a slide. . . . There is no time frame . . . [s]o [the test subjects are] pretty much on their own in terms of how long they wish to look at each of the images." Kass indicated that the test subject's level of interest or arousal and viewing times associated with each slide are used to determine the test subject's sexual interest in various people of different ages and genders. A computer analyzes the data and generates a chart, which, according to Kass, "shows the degree to which the person is interested in various individuals, by age and by gender. . . . Essentially . . . we're trying to . . . see whether . . . [the test subject has] indicated any interest in minors, in children. . . . The primary idea is to see whether . . . the [test subject] had indicated any inappropriate interest in minors." Kass testified that he had administered the Abel test, as well as other related tests,[4] to the defendant and that the test results did not indicate that the defendant had a sexual interest in male children.

Additionally, Kass testified that there "has been a lot of peer review and a lot of acceptance" of the Abel test by the Association for the Treatment of Sexual Abusers, of which he is a clinical member, and that the accepted error rate of the test is approximately 20 percent. He further testified that the test is generally accepted among psychologists who treat sexual offenders but that, outside of the field of clinical treatment, "there have been challenges to it." Specifically, he explained that, although the test often is included as part of a

[4] See footnote 3 of this opinion.

full evaluation of the treatment needs of convicted sex offenders, there is controversy within the field of clinical psychology as to whether the test is a valid tool for *diagnosing*, as opposed to *treating*, inappropriate sexual interest. Kass also acknowledged that the test had been devised as a tool to help with the treatment of known sex offenders, not as a diagnostic tool, and that the person who had developed the test, namely, Gene G. Abel, previously had stated that the test should not be used to screen pedophiles from the normal population. Kass further conceded that the guidelines of the Association for the Treatment of Sexual Abusers expressly provide that "viewing time test results [such as the results of the Abel test] . . . are never to be used to make inferences about whether an individual has or has not committed a specific sexual crime,"[5] because a person accused of a sexual crime against a child is unlikely to report his or her sexual interest in children. Indeed, Kass explained that "there's . . . no test that can be put together in a situation like this that would be able to verify whether a person did or did not commit a crime. What [the Abel test] does is . . . give some patterns, personality profiles, of the [test subject], which can be used in . . . working with [the test subject in treatment]."

In granting the state's motion in limine, the trial court concluded that the defense had failed to make a sufficient showing of relevancy or reliability with respect to Kass' testimony concerning the Abel test. Specifically, the court explained that, among the test's many shortcomings, it has an error rate of approximately 20 percent, it is predicated largely on self reporting by the

---

[5] See Association for Treatment of Sexual Abusers, Practice Standards and Guidelines, Standard 9.02 (2001) ("[m]embers shall not knowingly provide court testimony during the guilt phase of a criminal trial from which a reasonable person would draw inferences about whether the client did or did not commit a specific sexual crime").

test taker, and there is a significant question in the scientific community as to whether it has any viability as a screening or diagnostic tool rather than a treatment tool. Contrary to the defendant's claim, the record fully supports the trial court's conclusion.

"Because a trial court's ruling under *Porter* involves the admissibility of evidence, we review that ruling on appeal for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 214, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . [and] upset it [only] for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Martinez*, 295 Conn. 758, 769–70, 991 A.2d 1086 (2010).

"Once the party opposing the [admission of scientific] evidence objects, the proponent [of the evidence] bears the burden of demonstrating its admissibility." (Internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 87. "Generally, [a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific . . . knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. . . . In order to determine whether an expert witness' testimony concerning scientific evidence will assist the trier of fact, the trial judge must undertake a two part inquiry [in accordance with *Porter*]: [1] whether the reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid and . . . [2] whether that reasoning or methodology properly can be applied to the facts in issue. . . . In other words, before it may be admitted, the trial [court] must find

that the proffered scientific evidence is both reliable and relevant. . . .

"With regard to the reliability prong of the inquiry, the court in *Porter* identified four nonexclusive factors for [courts] to consider in determining whether a particular theory or technique is based on scientific knowledge: (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence and maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community. . . . We further noted that [s]everal other factors may properly play a role in a court's assessment of the validity of a scientific methodology . . . [including] whether the scientific technique underlying the proffered expert testimony was developed and implemented solely to develop evidence for in-court use, or whether the technique has been developed or used for extrajudicial purposes. . . . Recognizing the indefiniteness inherent in applying this multifactor approach, we observed that [t]he actual operation of each factor, as is the determination of which factors should be considered at all, depends greatly on the specific context of each case . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Griffin*, 273 Conn. 266, 282–84, 869 A.2d 640 (2005).

Applying these principles to the present case, we conclude that the trial court reasonably determined that the results of the Abel test administered to the defendant were not sufficiently reliable for admission into evidence. Although Kass testified that the Abel test had been subject to peer review and was widely accepted for *treatment* purposes, his testimony about the test's reliability as a *diagnostic* tool was far more equivocal. Indeed, Kass acknowledged that the Abel

test was developed to aid in the treatment of *known* sex offenders, that it is primarily used for such purposes, that there is disagreement in the scientific community as to whether it is a valid tool for diagnosing pedophiles, and that the person who created the Abel test has *himself* cautioned against the use of the test to screen pedophiles from the normal population. Kass also testified that a significant component of the Abel test depends on self reporting and that a person accused of a sexual crime is unlikely to report inappropriate sexual interests. Furthermore, although Kass stated that the accepted error rate for the Abel test is approximately 20 percent when the test is used for the treatment of *known* sex offenders, at least one case cited by the defendant indicates that the error rate *in detecting* pedophiles who attempt to conceal their sexual interests is as high as 64 percent. See *Ready* v. *Commonwealth*, Superior Court, Docket No. 00-10390 SDP, 2002 Mass. Super. LEXIS 557, *27 (Mass. Super. May 17, 2002), aff'd sub nom. *In re Ready*, 63 Mass. App. 171, 824 N.E.2d 474, cert. denied, 444 Mass. 1106, 830 N.E.2d 1088 (2005).

Finally, as the state notes, the vast majority of courts that have considered the admissibility of Abel test results have concluded that such results are not sufficiently reliable to be admitted in the guilt phase of a criminal trial. See, e.g., *United States* v. *Birdsbill*, 243 F. Sup. 2d 1128, 1136 (D. Mont. 2003) (Abel test results not admissible on ground that test is "not reliable for the purpose of characterizing the [d]efendant as being sexually interested or uninterested in boys under the age of [twelve] years"), aff'd, 97 Fed. Appx. 721 (9th Cir. 2004); *United States* v. *White Horse*, 177 F. Sup. 2d 973, 975–77 (D.S.D. 2001) (Abel test did not meet standards for admission of scientific evidence), aff'd, 316 F.3d 769 (8th Cir.), cert. denied, 540 U.S. 844, 124 S. Ct. 116, 157 L. Ed. 2d 80 (2003); see also *Ready* v.

*Commonwealth*, supra, 2002 Mass. Super. LEXIS 557, *42 ("anyone with a moderate level of intelligence could fake his [Abel test] results"); *State* v. *Spencer*, 339 Mont. 227, 239, 169 P.3d 384 (2007) (expert acknowledged that Abel test "could be 'beaten' "). Indeed, the defendant cites only one case in which a court had concluded that the results of the Abel test *were* admissible as evidence relevant to the determination of guilt. See *United States* v. *Robinson*, 94 F. Sup. 2d 751, 753–54 (W.D. La. 2000) (concluding that Abel test, which was relatively new at time of court's decision, was reliable because it had been found to be valid in four, "independent" research studies). Other courts, however, have declined to follow *Robinson*, concluding that it is not persuasive authority. See, e.g., *United States* v. *Birdsbill*, supra, 1133 (following *Ready*, rather than *Robinson*, in concluding that Abel test results inadmissible under *Daubert*); *Ready* v. *Commonwealth*, supra, *14– *49 (performing detailed analysis of numerous studies concerning Abel test, including those referred to in *Robinson*, and concluding that they did not establish that Abel test was valid tool for diagnosing inappropriate sexual interest). In light of the foregoing, the defendant cannot prevail on his claim that the trial court abused its discretion in excluding evidence of his Abel test results.

## II

The defendant next claims that the trial court violated his rights to confrontation and to present a defense when it precluded the defense from presenting evidence that C's mother had viewed pornographic and adult dating websites on the family computer before and after he moved out of the family residence. The defendant contends that this evidence was relevant to establish an alternative source for C's sexual knowledge. He further contends that the evidence, most especially the evidence relating to adult dating websites, demonstrated the extent to which his marriage to C's mother had

deteriorated and, therefore, was probative of her motive for fabricating the allegations against the defendant.

Prior to trial, the state filed a motion in limine to preclude the defendant from presenting evidence or adducing testimony that C's mother had viewed pornographic websites during or after her marriage to the defendant because such evidence was irrelevant to the issue of whether the defendant had sexually abused C. In response to the state's motion, the defendant filed a written offer of proof detailing the evidence that it intended to present at trial to impeach the testimony of C's mother with respect to her interest, motive and bias, and to establish an alternative source of C's sexual knowledge. The offer of proof consisted, in part, of allegations that the mother frequently viewed pornography on the family computer, both before and after the defendant moved out of the family residence, and that she had visited adult dating websites in that same time frame.

C was the first witness to testify at trial. During direct examination, C testified that the defendant had shown him pornographic images on the family computer from website X, a pornographic website that the defendant had bookmarked on his web browser. During cross-examination, C testified that he knew how to use the computer and how to access the Internet and the links that the defendant had bookmarked, and that he did not need permission to use the computer. C denied, however, ever having viewed that pornographic website, either on his own or with anyone other than the defendant.

The next witness for the state was C's mother. During direct examination, C's mother testified that she, the defendant and C all had access to the family computer and that C had used the computer by himself on several occasions. During cross-examination, defense counsel

attempted to impeach her credibility by probing her biases and potential motive for fabricating the charges against the defendant. In response to defense counsel's questions, C's mother acknowledged, inter alia, that (1) she and the defendant had gone to see a marriage counselor to discuss problems in their marriage, (2) she had ordered the defendant out of the family residence for five days in February, 2003, (3) she had injured the defendant during an argument in August, 2003, and then destroyed a video recording that the defendant had made to document his injury, and (4) she had received one half of the proceeds of the sale of the family residence and one half of the defendant's retirement savings as a result of their divorce.

At the conclusion of his cross-examination of C's mother, defense counsel sought to examine C's mother outside the presence of the jury for the purpose of making an offer of proof with respect to her use of the family computer to access pornographic and adult dating websites on that computer both before and after the defendant moved out of the family residence. The trial court granted defense counsel's request, and C's mother testified that, during their marriage, she and the defendant had used the family computer together to access pornographic websites. She further testified that, after the defendant moved out of the house, she had used the computer to access pornographic websites that previously had been accessed on the computer for the purpose of determining what images the defendant may have shown C. According to her testimony, the websites that she visited were either bookmarked on the web browser or appeared when she accessed the history stored in the browser.

In response to questions about adult dating websites, C's mother testified that, after the defendant had moved out of the family residence, she accessed the defendant's e-mail account and discovered a message from

a certain adult dating website. She testified that she subsequently logged onto that website using the defendant's username and password to ascertain the extent of his involvement in adult online dating. She denied, however, ever visiting that website or any other adult dating website for any other purpose.

Following the voir dire testimony of C's mother, defense counsel argued that the proffered evidence was relevant to establishing an alternative source of C's sexual knowledge because it demonstrated that someone other than the defendant had accessed pornographic websites on the family computer. Defense counsel maintained that, because C had been allowed to use the computer alone and knew how to access the Internet, it was possible that C had accessed pornographic websites on his own and, as a result, had gained the sexual knowledge necessary to fabricate his detailed allegations of sexual abuse against the defendant. Defense counsel also contended that the adult online dating evidence was relevant to show C's mother's motive for fabricating the allegations against the defendant because it suggested that she might have been looking for new sexual partners, which, according to defense counsel, bolstered the defendant's claim that she wanted to end the marriage.

The trial court rejected defense counsel's claims and granted the state's motion to preclude the admission of the challenged evidence. With respect to the adult online dating evidence, the trial court concluded that the connection between that evidence and the motive of C's mother for fabrication was "tenuous" at best and, therefore, lacking in relevance. The trial court further concluded that evidence that C's mother had accessed pornographic websites was inadmissible under *State* v. *Rolon*, 257 Conn. 156, 184, 777 A.2d 604 (2001), in which this court concluded that, for purposes of demonstrating the admissibility of evidence of a child victim's

prior sexual experience to show an alternative source of the child's sexual knowledge, the proffered evidence must demonstrate that (1) the prior act or acts clearly occurred, (2) the prior act or acts closely resemble the act or acts that are the subject of the criminal charges, (3) the prior act or acts are clearly relevant to a material issue, (4) the evidence is necessary to the defendant's case, and (5) the probative value of the evidence outweighs its prejudicial effect. The trial court found that the evidence that defense counsel proffered failed to satisfy the first and second prongs of *Rolon*. In addition, the court stated that the evidence had "no probative" value and that "[i]ts prejudicial effect against the state would be substantial."[6]

On appeal, the defendant renews the claims that defense counsel raised in the trial court with respect to the admissibility of the proffered evidence concerning the use of the family computer by C's mother to access adult dating and pornographic websites. We reject the defendant's claims.

With respect to the defendant's claim regarding the adult online dating evidence, the trial court did not abuse its discretion in excluding evidence that C's mother had visited an adult dating website after the defendant had moved out of the family residence because that evidence was not probative of her alleged motive to fabricate the allegations of sexual abuse. The trial court reasonably concluded that any nexus between that evidence and the mother's purported motive to fabricate, namely, that she wanted to end the marriage so that she would be free to pursue new sexual partners, simply was too attenuated to warrant the admission of that evidence. Experience and common

---

[6] See Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence").

sense dictate that there are far easier and less traumatic ways to end a marriage, and there is nothing in the record to suggest that C's mother had any reason to resort to false allegations of child sexual abuse to achieve that end. Moreover, in her voir dire testimony, C's mother explained that she had accessed the adult dating website only after the defendant had left the family residence and only to ascertain the nature and extent of the defendant's online activities.[7] Accordingly, in the absence of any logical connection between C's mother's use of the computer to view an adult dating website and her testimony corroborating C's allegations of sexual abuse by the defendant, the trial court correctly concluded that the defendant was not entitled to present evidence to the jury concerning the fact that C's mother had accessed an adult dating website.[8]

The defendant also cannot prevail on his claim that the trial court improperly precluded him from adducing evidence concerning the fact that C's mother viewed pornographic websites on the family computer. It is

[7] Indeed, defense counsel offered no other evidence to support the theory of the mother's motive, such as evidence that she actually had corresponded with someone through an adult dating website, that she had posted personal information about herself or advertisements online, that she had responded to personal advertisements online, or that she had created an account for herself on an adult dating website.

[8] The defendant also contends that, because the state introduced evidence of his online pornography use through C's testimony that the defendant had bookmarked website X, a pornographic website, "fundamental fairness and evenhandedness required that [the defense] be allowed to present evidence . . . that others in the [family residence] . . . were accessing such websites." The defendant, however, does not claim any impropriety with respect to the admission of C's testimony regarding the aforementioned website and bookmark evidence. He contends, rather, that, because he was prejudiced by this evidence, the trial court was obligated to balance this prejudice by admitting evidence that C's mother also viewed pornography. The defendant cites no authority, however, and we are aware of none, for the proposition that a trial court must allow the admission of irrelevant and prejudicial evidence solely for the purpose of balancing the potentially prejudicial effect of properly admitted evidence.

true, as the defendant maintains, that evidence of an alternative source of a child's sexual knowledge may be material in a case of alleged child sexual abuse to rebut the presumption that the child could not have fabricated a claim of abuse because a person of such tender years would not otherwise have knowledge about matters pertaining to sexual conduct. "Without that evidence, [t]he inference that [a child] could not possess the sexual knowledge he [or she] does unless [a defendant] sexually assaulted [him or her] greatly bolsters [the child's] allegations." (Internal quotation marks omitted.) *State* v. *Rolon*, supra, 257 Conn. 185–86; see also *Oatts* v. *State*, 899 N.E.2d 714, 724 (Ind. App. 2009) ("The [sexual innocence inference] theory is based on the premise that because most children of tender years are ignorant of matters relating to sexual conduct, a child [victim's] ability to describe such conduct may persuade the jury that the charged conduct in fact occurred. To demonstrate that the child had acquired sufficient knowledge to fabricate a charge against the defendant, the theory reasons, the court should allow the defense to offer evidence that the child acquired sexual [knowledge from some other source] before he or she accused the defendant." [Internal quotation marks omitted.]). The evidence proffered for that purpose, however, must be probative of the existence of that alternative source of sexual knowledge.

In the present case, the evidence failed to satisfy that threshold requirement. As the trial court explained, although the evidence clearly established that C's *mother* had accessed pornographic websites, it by no means established that *C* had accessed such websites. In fact, C indicated in his testimony that he did not access pornographic websites on his own or with anyone other than the defendant. At most, the evidence supported an inference that C *could have* used the family computer to access pornography on his own. As the

trial court noted, however, even if the jury reasonably could draw such an inference, defense counsel adduced no evidence indicating that the images that C saw when he visited those websites in any way resembled the acts that he later claimed to have been perpetrated on him by the defendant. Because the evidence that defense counsel proffered provided no basis on which the jury reasonably could have concluded either that C had visited pornographic websites on his own or that he had viewed images of conduct similar to the conduct attributed to the defendant, the trial court properly excluded the evidence.[9]

Finally, as we previously indicated, C testified regarding his use of the family computer. In particular, he stated that he knew how to use the computer, that he did not need permission to use it, and that he knew how to access the Internet and websites that were bookmarked on the web browser. He also testified that website X, a pornographic website, was bookmarked

---

[9] For the first time on appeal, the defendant contends that *Rolon* does not govern the admissibility of the testimony of C's mother in the present case because *Rolon* involved the sexual knowledge of a child victim that was based on that child's previous sexual *conduct*, conduct that otherwise would have been protected from disclosure by General Statutes § 54-86f. See, e.g., *State* v. *Cecil J.*, 291 Conn. 813, 825, 970 A.2d 710 (2009) (explaining that, in *Rolon*, this court adopted test that defendant must satisfy "in order for evidence of a victim's prior sexual conduct to be admissible under § 54-86f to show a source for the victim's sexual knowledge"). The defendant maintains that, because viewing pornography is not the kind of prior sexual conduct that is protected by § 54-86f, the considerations underlying our decision in *Rolon* and, in particular, the test that we adopted in that case, are not applicable to the present case. We need not decide whether the trial court properly determined that the *Rolon* test is applicable in the present context because the trial court reasonably concluded that any possible connection between the proffered evidence and the alleged, alternative source of C's sexual knowledge was so remote that the jury would be required to speculate as to any such relationship. Thus, the trial court's decision to bar the evidence was proper irrespective of whether the test for admissibility that we recognized in *Rolon* applies in the circumstances of the present case.

on the web browser. In light of this testimony, we agree with the state that, to the extent that C's mother's computer use was proffered to establish that the Internet was a possible alternative source of C's sexual knowledge, that evidence was unnecessary because C's own testimony more than adequately established this point to the jury.

### III

We next address the defendant's claim that the trial court improperly permitted the state to elicit testimony from Larry Rosenberg, an expert on the reporting of sexual abuse by child victims, that the primary purpose of the forensic interview of an alleged child victim of sexual abuse is to determine whether the child's allegations are credible. The defendant contends that this testimony, which the state elicited during its redirect examination of Rosenberg, constituted improper opinion testimony regarding the credibility of C in that it allowed the jury to infer, albeit indirectly, that, because charges ultimately were brought against the defendant, the forensic interviewers must have determined that C's claims were credible. We conclude that the defense opened the door to the challenged testimony and, therefore, that the trial court did not abuse its discretion in permitting the state to elicit the challenged testimony.

Rosenberg, the clinical director of the Child Guidance Center of Southern Connecticut, testified as an expert for the state on the reporting of sexual abuse by child victims. Although he never had interviewed C, Rosenberg testified about various factors that can contribute to inaccuracies in a child's report of abuse and about certain features of a forensic interview that are designed to reduce the risk of inaccuracies. He explained the forensic interview process as follows: "What we do is we interview children in front of . . . a one-way mirror with . . . [a] representative of the police department

and a representative of protective services [who observe] that interview so that the child is only interviewed one time by a professional [who is] trained to do these sorts of interviews and is sensitive to the child as well. . . .

"[The child is interviewed only once because] children are prone to change things from time to time when they are asked questions repeatedly, and they can be susceptible to that, forgetting exactly what they said the time before. They may alter their story inadvertently . . . as we all do when we recount stories of things that have happened to us in the past. But [it is] particularly more the case . . . the younger the child is. And [it is] important, too, that somebody [who is] trained and understands children from the developmental perspective is conducting the interview as opposed to a police officer or other protective service worker . . . ."

During cross-examination, defense counsel, who previously had used the forensic interview of C to impeach C on the basis of inconsistencies and omissions in his testimony, asked Rosenberg several questions about the purpose of a forensic interview and the wisdom of conducting the interview only once:

"[Defense Counsel]: . . . [I]n terms of dealing with the child, in terms of your counseling of the child, ultimately, you want to get to the truth, right?

"[Rosenberg]: In counseling, sure.

"[Defense Counsel]: And so—but wouldn't it be better, then, for you to talk to the child more than one time about the details of the offense that is supposed to have occurred . . . if you can get to the truth?

"[Rosenberg]: . . . There's a distinction between . . . [counseling and] a forensic evaluation of [a] child.

\* \* \*

"[Defense Counsel]: Okay. So, the most important thing in dealing forensically with a child on a claim of child sex abuse is to get to the truth, correct?

"[Rosenberg]: That's correct.

\* \* \*

"[Defense Counsel]: So . . . I take it whatever the child says the first time [in a forensic interview], you assume to be true?

"[Rosenberg]: No.

\* \* \*

"[Defense Counsel]: You just take the [forensic] interview as it is and go from there for counseling purposes?

"[Rosenberg]: The purpose of [the] forensic interview and counseling are two separate experiences, if I may. *The forensic interview is for the purpose of . . . hearing a child's disclosure for determining whether that disclosure is credible or not.* A therapeutic relationship is for the purpose of helping a child to deal with whatever has occurred to them and the symptoms that might have resulted from it.

"[Defense Counsel]: Okay. And so in a counseling situation, you would talk to the child many times?

"[Rosenberg]: Sure.

"[Defense Counsel]: And in the forensic interview . . . you would talk to the child once?

"[Rosenberg]: . . . [Y]es. But let me be clear about it . . . . [A forensic interview and therapeutic counseling establish] two different relationships.

"[Defense Counsel]: Fair enough. But the forensic interview is a one-time interview?

"[Rosenberg]: That's correct." (Emphasis added.)

During redirect examination, the senior assistant state's attorney (state's attorney) followed up on the distinction between therapeutic counseling and a forensic interview:

"[State's Attorney]: . . . [Y]ou testified . . . [that you perform a forensic interview only] once so that the child [does not] have to constantly relate to strangers his or her experiences of being sexually abused?

"[Rosenberg]: That's true.

\* \* \*

"[State's Attorney]: . . . And is it typical that, after a child submits to a forensic interview . . . if the complaint is deemed credible . . . the child normally [will] go for therapeutic counseling?

"[Rosenberg]: That . . . happens a fair amount of the time. . . .

"[State's Attorney]: [Then] [t]he typical procedure is you have the child go in for the [forensic] interview, and [he or she] recount[s], to the best of [his or her] ability, the incidents of child sex abuse. Fair statement? . . .

"[Rosenberg]: Fair statement.

"[State's Attorney]: And, basically, what they say [during] the interview is recorded and . . . is given to the authorities to deem, or rather people at child guidance or Yale Sex Abuse Clinic . . . to deem whether or not the allegation is credible . . . ?"

Defense counsel objected at this point, claiming that the question "usurp[s] the jury's function to determine in this case if the complaint is credible." The state's attorney responded that the defense had opened the door to the question during cross-examination, but he

agreed to rephrase the question, asking instead, "after you do the forensic interview, that interview is used to determine whether the allegation is credible?" The court overruled defense counsel's objection, and Rosenberg answered that "[the forensic interview is] used by the interviewer to determine the credibility of the child in the opinion of the person [who is] conduct[ing] the interview."

As the defendant contends, "[t]he determination of the credibility of a witness is solely the function of the jury. . . . [Accordingly] [i]t is the trier of fact [that] determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses [therefore] cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims. . . .

"Additionally, in cases that involve allegations of sexual abuse of children, we have held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful. . . . In this regard, we have found expert testimony stating that a victim's behavior was generally *consistent with* that of a victim of sexual or physical abuse to be admissible, and have distinguished such statements from expert testimony providing an opinion as to whether a particular victim had *in fact* suffered sexual abuse. . . .

"Moreover, we have noted that even indirect assertions by an expert witness regarding the ultimate issue in a case can serve inappropriately to validate the truth-

fulness of a victim's testimony." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634–35, 881 A.2d 1005 (2005).

It also is well established, however, that, as a general matter, "a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it [when] the party initiating inquiry has made unfair use of the evidence. . . . [T]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context. . . .

"In determining whether otherwise inadmissible evidence should be admitted to rebut evidence offered by an opposing party, the trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter . . . and should permit it only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence . . . . Accordingly, the trial court should balance the harm to the state in restricting the inquiry with the prejudice suffered by the defendant in allowing the rebuttal. . . . We will not overturn the trial court's decision unless the trial court has abused its discretion." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 822, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

In the present case, defense counsel questioned Rosenberg extensively as to why a forensic interview, in contrast to an interview conducted for the purpose of counseling, is performed only once. In questioning Rosenberg in this manner, defense counsel sought to highlight the distinction between the two types of interviews, apparently for the purpose of demonstrating that forensic interviews may be less likely to uncover the truth than interviews conducted in a counseling setting. Having questioned Rosenberg about the purposes of the two different kinds of interviews, defense counsel opened the door to redirect examination on this subject. Indeed, the question that the state's attorney ultimately posed to Rosenberg during redirect examination, that is, "is . . . the forensic interview . . . used to determine whether the allegation is credible," was substantively identical to defense counsel's questioning of Rosenberg as to whether the purpose of the forensic interview "is to get to the truth . . . ." Moreover, Rosenberg's response to the inquiry of the state's attorney during redirect examination was not materially different from his response to the questions that defense counsel had posed to him during cross-examination. Accordingly, the defendant cannot prevail on his claim that the trial court abused its discretion in permitting the state's attorney to adduce this testimony from Rosenberg.

IV

We next address the defendant's claim that the state's attorney improperly used the term "victim" in referring to C because that reference represented an improper expression of the state's attorney's personal belief that C, in fact, had been victimized sexually by the defendant. The defendant refers to only one occasion during

the course of the entire trial when the state's attorney made such a reference.[10]

This claim requires little discussion because it is governed by our decision in State v. Warholic, 278 Conn. 354, 369–70 and n.7, 897 A.2d 569 (2006), in which we rejected a claim that the prosecutor's use of the term "victim" on two occasions during trial was improper. Although, in Warholic, we cautioned the state "against making excessive use of the term 'victim' to describe a complainant when the commission of a crime is at issue because prevalent use of the term may cause the jury to draw an improper inference that the defendant committed a crime against the complainant"; id., 370 n.7; we nevertheless observed that, in contrast to the trial court's identification of the complainant as the victim; see State v. Cortes, 276 Conn. 241, 249 n.4, 885 A.2d 153 (2005) (trial court's repeated use of term "victim" in jury charge was improper); the "jury was likely to understand that the [prosecutor's] identification of the complainant as the victim reflected the [prosecutor's] contention that, based on the . . . evidence, the complainant was the victim of the alleged crimes." (Emphasis added.) State v. Warholic, supra, 370. As in Warholic, the state's attorney's isolated use of the term "victim" in the present case was neither improper nor prejudicial, and, consequently, the defendant's claim is without merit.[11]

V

The defendant also claims that certain of the state's attorney's remarks during closing argument deprived

[10] The state's attorney used the term "victim" in responding to a hearsay objection that defense counsel had made during the state's attorney's examination of C's mother.

[11] We note that, although the trial court had denied the defendant's motion in limine to preclude the state from using the term "victim" when referring to C, the state's attorney prudently avoided the use of that term except on the one occasion that the defendant has identified.

the defendant of a fair trial. Specifically, the defendant contends that the state's attorney improperly (1) expressed his personal opinion regarding the credibility of witnesses by making statements such as, "I think if you [look at the evidence objectively] you'll find that . . . the evidence shows that [C's] testimony was credible, it was definitive, and it supports the claim that he has made of sexual abuse," (2) argued that the defendant's interest in avoiding punishment was relevant to his motive to testify falsely, (3) appealed to the jurors' emotions by asking them to imagine how C felt while testifying and to consider how those feelings may have affected his demeanor during that testimony, (4) disparaged the theory of the defense that C's mother had thrown the defendant out of the family residence over a dispute about the possible purchase of a dog, (5) maintained that the defendant's trial testimony was inconsistent with testimony that the defendant had given during a deposition taken in connection with his divorce from C's mother, (6) argued that certain of the defendant's conduct demonstrated consciousness of guilt, (7) treated the defendant's prior felony conviction for operating a motor vehicle while under the influence of alcohol, which had been admitted solely for impeachment purposes, as substantive evidence, (8) attacked the defendant's character by ridiculing his testimony that, in his divorce proceeding, he had downplayed some of the difficulties in his marriage to C's mother so as not to embarrass her, and (9) diluted the state's burden of proof by characterizing the jury's task as determining whether the defendant, on the one hand, or C and his mother, on the other, had testified truthfully.

"It is well settled that, in addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in

the heat of the argument. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Warholic,* supra, 278 Conn. 362–63.

Upon careful review of the record, we agree with the state that each of the challenged statements, when considered in the context in which they were made and in light of the evidence adduced at trial, fell well within the limits of fair argument. Because the comments of the state's attorney were based on the evidence and were neither inflammatory nor inaccurate, the defendant's claim of prosecutorial impropriety must fail.

VI

Finally, the defendant claims that the sentence that the trial court imposed for his conviction of sexual assault in the first degree, that is, a term of imprisonment of twenty years, execution suspended after twelve years, and twenty years probation, was illegal. General Statutes § 53a-70 (b) (3) provides: "Any person found guilty [of sexual assault in the first degree] shall be sentenced to a term of imprisonment *and a period of special parole* pursuant to subsection (b) of section 53a-28 which together constitute a sentence of at least ten years." (Emphasis added.) As the state concedes, the sentence that the trial court imposed does not comply with § 53a-70 (b) (3) because it includes a period of probation rather than a period of special parole. Accordingly, the case must be remanded to the trial court for resentencing on the defendant's conviction of sexual assault in the first degree.[12]

[12] Although the defendant did not raise this claim in the trial court, this court is authorized to correct an illegal sentence at any time pursuant to Practice Book § 43-22. See, e.g., *State* v. *Tabone,* 279 Conn. 527, 534, 902 A.2d 1058 (2006).

The judgment is reversed only as to the sentence imposed for the defendant's conviction of sexual assault in the first degree and the case is remanded for resentencing on that count; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.