Filed 6/6/17

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO FORTIN,<br><br>    Defendant and Appellant. | 2d Crim. No. B271184<br>(Super. Ct. No. VA136073)<br>(Los Angeles County) |

        Pedro Fortin was charged with molesting two young girls. Through use of the "Abel Assessment for Sexual Interest" (Abel test), he sought to prove that he does not have a sexual interest in children. He was rebuffed. The prosecution, however, was permitted to introduce evidence of the Child Sexual Abuse Accommodation Syndrome (CSAAS) to explain why child victims

---

     *Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. Parts 2, 3 and 4 of the Discussion section of this opinion are not certified for publication. Those parts are identified as those portions between double brackets, e.g., [[/]].

of sexual abuse may delay in making a report. Fortin was convicted of child molestation (Pen. Code, §§ 288, 288.7[1]) and false imprisonment by violence (§§ 236, 237). As we shall explain, the trial court did not err in either ruling.

The Abel test results were properly excluded in the guilt phase of this criminal prosecution for want of acceptance by the relevant scientific community. Appellant's objection to the CSAAS was properly overruled once the victims' credibility was placed in issue, and its use was circumscribed by a limiting instruction. We affirm the convictions. We reverse the sentence and remand to the trial court to make a satisfactory record of the basis for its exercise of its discretion to order consecutive sentences. (§§ 667.61, 669.)

## FACTS

### *Testimony About the Molestations*

Fortin and his family lived in an apartment house in Bell Gardens. Residing in same building were Kimberly Doe and Vanessa Roe, both born in 1999 and close in age to Fortin's two daughters. The four children were friends and frequently met in Fortin's apartment, over a two-year period. Fortin sat in the living room as the children played or watched television, and was friendly with them.

Vanessa testified that when she was around seven years old, Fortin suggested that they "play doctor" while his wife was out shopping. He pretended to be a doctor and had the girls enter a bedroom to see him, one at a time. When Vanessa entered the bedroom, Fortin locked the door, pushed her onto the bed, lifted her shirt, and licked her stomach. Vanessa pushed him away and left the room. She was scared and did not know

---

[1] Unlabeled statutory references are to the Penal Code.

2

how to tell her mother what happened.  Vanessa continued to visit Fortin's apartment to see his daughters, but was cautious around him.

When Vanessa was still around seven years old, Fortin scooted over to sit next to her on the sofa during a visit.  His wife was in the kitchen.  Fortin placed a throw pillow over Vanessa's lap, then put his hand inside of her pants and digitally penetrated her.  She removed his hand; he tried to touch her again but she prevented him.  Vanessa was very scared but did not tell her parents about the incident, out of concern that they would see her in a different light.

Fortin complimented Vanessa but also said inappropriate things on occasion, including, "I want to make love to you."  He did not try to touch her again.  Vanessa remained friends with Fortin's daughters until he and his family moved away.  Vanessa's mother noticed that Vanessa "was a bit scared" when she went to play with Fortin's daughters, but when asked, Vanessa said everything was okay.

Kimberly testified that when she visited Fortin's apartment at age six or seven, he approached her three or four times and said "dirty words" in her ear, meaning sexual talk.  He told her that she "was old enough" and simulated fellatio.  While his daughters were in the kitchen, he leaned over Kimberly as she played with dolls, put his hands on her shoulders then slowly slid them down her chest and squeezed her breasts.  He touched her breasts, over her clothing, on more than one occasion.

After Fortin touched her breasts, Kimberly did not feel comfortable with him.  At age seven, she went to visit Fortin's daughters.  When she saw her friends depart to go shopping, Kimberly began to pick up her dolls to leave.  Fortin

3

grabbed her arm forcefully, pulled her into his bedroom, and closed the door. No one else was home. He removed her shorts. When she tried to stop him, he pushed her and would not allow her to leave. Fortin unbuckled his belt, unzipped his pants, and told her to put his penis in her mouth. She said, "no." He pulled her onto the floor and forced his penis into her mouth by grasping her shoulders and jerking her head onto him. Kimberly was crying and tried to escape. Fortin warned her not to tell her mother or else he would keep doing it, which she interpreted to mean molesting her and making sexual talk. As soon as she was able to pull away, she dressed, ran home, and brushed her teeth.

Kimberly believed Fortin's threats and was scared. She did not tell her mother or her older brother. She continued to visit Fortin's apartment to play with his daughters after the oral copulation incident because she did not think that it would happen again.

A few weeks later, while his daughters were in the yard, Fortin again grabbed Kimberly's arm, took her to his bedroom, and closed the door. When she objected, he said "be quiet," and pushed her down as she tried to leave. He removed her shorts, spread her legs, and put his penis in her vagina. She was crying, scared and in pain.

As Kimberly pulled her shorts on, Fortin told her not to inform her mother what happened. Kimberly ran home and bathed because she did not want to smell Fortin's "musk" on her. Kimberly did not say anything because she was scared. Her vagina hurt for the rest of the night. After that incident, she played outside with Fortin's daughters, but never again entered his apartment.

Kimberly's mother testified that Kimberly was between six and seven years old when she began playing at Fortin's apartment. One day, Kimberly came home crying, but would not say what happened. She is not a child who cries easily. After that day, her daughter did not reenter the Fortin residence.

Around the time of the molestations, Vanessa and Kimberly shared what happened with each other, but did not tell other people. After Kimberly moved away, the two girls stayed in touch through social media.

Kimberly did not want to speak to anyone about the molestations. Time had passed and she had, in her words, "already moved on." In July 2014, when Kimberly was 13, her mother chastised her for playing outside with boys (as Kimberly recalled) or because she was having problems at school (as her mother recalled). Kimberly began to cry and told her mother what Fortin had done. Kimberly explained that she was too fearful to disclose the misconduct sooner; she thought Fortin might harm her mother because he made threats.

In tears, Kimberly and her mother went to inform Vanessa's parents about the molestations. Vanessa was questioned, began crying, and admitted that Fortin had touched her. Both families reported the molestations to the police.

### Expert Testimony

Clinical psychologist Jayme Jones testified for the prosecution about CSAAS and its application to situations in which the child knows the abuser. Dr. Jones listed the elements of CSAAS: (1) secrecy due to the lack of witnesses to the abuse; (2) helplessness because children are dependent and physically small; (3) accommodation to cope with ongoing abuse because children are typically taught to obey adults; (4) delayed

5

disclosure; and (5) recanting, particularly if child welfare authorities get involved. In most cases children never disclose abuse, or disclose belatedly, or disclose in bits and pieces to see if it provokes a negative reaction in people hearing about it. The longer children hide the abuse, the guiltier they feel, making disclosure increasingly difficult. Children do not generally fabricate stories about abuse. Dr. Jones testified that CSAAS "doesn't tell us who has been abused."

A defense psychologist, Mitchell Eisen, confirmed the five elements of CSAAS, but noted that it is based on clinical observations in incest cases, not on a scientific study. He described the first three elements of CSAAS as "commonsensical." He disputed the delayed disclosure element because there is no "typical" child victim who discloses in the "typical" way suggested by CSAAS, and no evidence to support the idea that children generally delay disclosure of abuse.

Clinical psychologist Roberto Flores de Apodaca, a defense expert, reviewed Fortin's personal history, sexual history, criminal history, mental health and substance abuse history, marital history, and occupational history. Dr. Flores opined that the information he collected suggested that Fortin does not have a propensity to engage in sexual acts with children.

### Testimony From Fortin and His Relatives

Fortin's wife insisted that she was always present when Vanessa and Kimberly came to play, though she was sometimes busy cooking or doing laundry. Fortin was home twice a week during the day, but did not interact with the children, and typically went to visit his brother, who lived in the same complex. She opined that her husband is a hard-working, respectable man. She has never seen him act inappropriately with children. A

6

brother-in-law similarly testified that Fortin is responsible, loving and respectful.

Fortin's daughters confirmed that their friends Kimberly and Vanessa came, two to three times per week, to play dolls and watch television in the living room of the Fortin apartment. Fortin was sometimes there, but was never alone with the girls. The children got along well and did not argue, but one day Kimberly stopped coming over to play, and, thereafter, neither did Vanessa.

Testifying on his own behalf, Fortin denied committing all of the acts described by Vanessa and Kimberly, denied being alone with them, and denied being sexually attracted to young girls. During an interview at the police station, the police used a ruse and told Fortin that his DNA was found on the victims' underwear. Fortin replied that it could not be true because he did not do anything.

### *The Charges, Verdict and Sentence*

Fortin was charged by information with seven felonies. The jury deadlocked on counts 1 (sexual intercourse or sodomy upon Kimberly, § 288.7, subd. (a)) and 2 (oral copulation or sexual penetration upon Kimberly, § 288,7, subd. (b)). Those counts were dismissed.

Fortin was convicted in counts 3 and 4 of committing lewd acts upon Kimberly, a child under the age of 14. (§ 288, subd. (a).) In count 7, he was convicted of sexually penetrating Vanessa, a child under the age of 10. (§ 288.7, subd. (b).) In count 8, he was convicted of a forcible lewd act upon Vanessa, a child under the age of 14. (§ 288, subd. (b)(1). In count 9, he was convicted of falsely imprisoning Vanessa by violence. (§ 236.) As to counts 3, 4, 7 and 8, the jury found that Fortin had substantial

7

sexual conduct with each child.  As to counts 3, 4 and 8, the jury found that Fortin committed offenses against multiple victims.

Fortin was sentenced to consecutive terms of 15 years to life on counts 3, 4, 7 and 8.  The aggregate sentence was 60 years to life.  A three-year term on count 9 was stayed.  (§ 654.)

## DISCUSSION

### *1.  Exclusion of Abel Test Results*

The trial court allowed Dr. Flores to opine that Fortin lacks sexual interest in prepubescent children, but did not allow testimony about Fortin's performance on the Abel test.  The court found that the Abel test has not been adequately peer-reviewed; is not accepted in the scientific community; is designed to monitor convicted sex offenders; and is not intended for use in trials to determine a defendant's guilt or innocence.  Fortin contends that excluding Abel test results violated his constitutional right to due process and to confront witnesses.  He "forfeited his constitutional claims by failing to object on these grounds at trial." (*People v. Carter* (2003) 30 Cal.4th 1166, 1196, fn. 6.)

A qualified expert may testify on a subject beyond common experience if based on material "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject[.]"  (Evid. Code, § 801, subd. (b).)  The trial court has broad discretion to determine whether proposed expert testimony lacks the necessary foundation to be reliable, relevant and admissible.  (*People v. Lucas* (2014) 60 Cal.4th 153, 226-227, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)  The court may exclude expert testimony based on unreliable material.  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.)

8

Establishing reliability is the overriding factor when a party seeks to admit evidence based on a new scientific technique. (*People v. Leahy* (1994) 8 Cal.4th 587, 594.) The courts look to see whether a new technique is "'*sufficiently established to have gained general acceptance in the particular field in which it belongs.*'" (*Ibid*; *People v. Kelly* (1976) 17 Cal.3d 24, 30; *People v. McWhorter* (2009) 47 Cal.4th 318, 364-365.) To be "new"—both to science and to the law—"a technique must be meaningfully distinct from existing techniques. [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 316.) The concern is that an unproven technique may appear "'in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury.' [Citation.]" (*Ibid*.)

California courts have yet to recognize that the Abel test may be used in cases involving sex offenses against children. "Once an appellate court has affirmed in a published opinion a trial court ruling admitting evidence based on a new scientific technique, the precedent may control future trials, at least until new evidence is presented that reflects a change in the scientific community's attitude. [Citation.]" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1257; see e.g., *People v. Jackson, supra,* 1 Cal.5th at p. 320 [with a proper foundation, dog scent trailing evidence can be heard by the jury because it has been admissible in California courts since 1978]; *People v. Huggins* (2006) 38 Cal.4th 175, 200 [hair comparison evidence identifying a suspect or victim has been routinely admitted in California for many years]; *People v. Wilkinson* (2004) 33 Cal.4th 821 [barring polygraph evidence because the scientific community deems it unreliable does not violate the defendant's federal constitutional rights].)

9

Dr. Flores appeared at a hearing to determine if there is an adequate foundation to admit evidence of Abel test results. (Evid. Code, § 402.) He testified that the Abel test covertly detects whether someone has persisting sexual interest in prepubescent children.[2] The state Department of Corrections recommends Abel assessments for parolees convicted of sex offenses. It has been administered over 170,000 times, has "a growing legacy," and Dr. Abel and his associates have published papers attesting to its validity and reliability. Dr. Flores conceded that the Abel test is not universally accepted and test results are not always allowed in court.

Dr. Flores acknowledged several important points, all of which undermine the evidentiary value of the Abel test. First, the Abel test assesses "persisting" interests of convicted sex offenders, and cannot be used to determine whether a person is (or is not) likely to be a sex offender. The test assumes that the person has already admitted to sexual misconduct. Second, the test has not been peer reviewed because Dr. Abel exercises proprietary rights and refuses to share his formula with other scientists. Third, the scientific community does not generally accept the Abel test as a diagnostic test for pedophilia.

_____

[2] The test-taker's left hand is immobilized while the right hand clicks on a computer through photographs of both genders, from preschoolers to adults, clad in bathing suits. An index assesses how much time the test-taker spends on each photograph; it does not focus on how the test-taker consciously rates the images as sexually arousing or disgusting. The Abel test is never used to infer whether someone committed a particular sex act; rather, it reveals which categories provoke persisting sexual interest.

Dr. Flores is aware that someone facing criminal charges for molesting children would be motivated to rush through photos of underage children while the test is being administered; there is no way to avoid false negatives and false positives with the Abel test; and "there are a number of ways to thwart the test." Dr. Flores cannot interpret the test results himself. The responses must be sent to Dr. Abel in Atlanta for analysis; Dr. Flores must assume that there is no computer glitch in Atlanta and that the results are legitimate.

A defense expert may rely on an interview and his interpretation of standardized written personality tests to opine that a defendant does not show signs of "deviance." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1140.) In *Stoll*, the expert administered two standardized tests, including the Minnesota Multiphasic Personality Inventory—the most widely used psychological test in the nation—as "a springboard for a far more normative and subjective diagnostic process" leaning heavily upon patient interviews, case history, and past experience. (*Id.* at pp. 1147, 1159.) The expert could proffer an ultimate opinion about Stoll because the testimony met "traditional standards for competent expert opinion." (*Id.* at p. 1161.)

Unlike the widely accepted standardized tests used by the expert in the *Stoll* case, the Abel test is a new scientific technique, process or theory. The Abel test has been deemed unreliable by the Supreme Courts of Connecticut, Maine, Montana, North Dakota and Texas.[3] It has also been rejected in

---

[3] *State v. Victor O.* (Conn. 2011) 20 A.3d 669, 678-679 [Abel test is "not sufficiently reliable for admission into evidence" during the guilt phase of a criminal trial because it is designed to treat *known* sex offenders and has a 64 percent error rate when

federal court.  (See *United States v. Birdsbill* (D. Mont. 2003) 243 F.Supp.2d 1128, 1132-1136, aff'd. (9th Cir. 2004) 97 Fed.Appx. 721 [Abel test is "merely an untested and unproven theory" that is "highly unreliable" due to its high error rate and susceptibility to manipulation]; *United States v. White Horse* (D. S.D. 2001) 177 F.Supp.2d 973, 976, aff'd. (8th Cir. 2003) 316 F.3d 769, 774-775 [Abel test does not satisfy federal admissibility requirements].)  A new theory that has been repeatedly rejected by courts nationwide cannot be given the imprimatur of a "routine" or accepted method of testing defendants facing criminal charges. (*People v. Leahy, supra,* 8 Cal.4th at p. 605-606.)

The trial court did not abuse its discretion by excluding testimony about Fortin's performance on the Abel test. The courts of sister states have consistently found the Abel test to be unreliable.  It has not gained acceptance as a way to prove or disprove an accused's sexual interest in children during the guilt phase of a criminal trial.  Dr. Flores cast doubt on the use of the

---

used to detect pedophiles]; *State v. Ericson* (Me. 2011) 13 A.3d 777, 781-782 [Abel test is "unreliable" because it has not been peer reviewed, is not designed to detect whether a child was abused, was tested only on admitted sex offenders, and has a high error rate]; *State v. Spencer* (Mont. 2007) 169 P.3d 384, 393-394 [testimony based on Abel test results was properly excluded because the expert agreed that the test was controversial, could be thwarted, and had varying success rates]; *State v. Austin* (N.D. 2007) 727 N.W.2d 790, 795-796 [expert testimony was properly excluded because the Abel test used to evaluate the defendant is not designed to determine whether he committed a sex crime against a child]; and *In re M.P.A.* (Tex. 2012) 364 S.W.3d 277, 286-289 [Abel test is unreliable and inadmissible].  See also *In re Ready* (Mass.App. 2005) 824 N.E.2d 474, 476-480 [Abel test is seriously flawed and was properly excluded at trial].

Abel test by acknowledging that the test assesses "persisting" sexual interests in *convicted* offenders, has not been peer reviewed, is not generally accepted in the scientific community to diagnose pedophilia, and can be thwarted by the test-taker. Under the test's user terms, Dr. Flores is not permitted to analyze or interpret Abel test results:  he must send the results to Atlanta, then *assumes* proper analysis by Dr. Abel or trained staff and *assumes* the legitimacy of the results.

A proper foundation was not laid to admit Dr. Flores's proposed testimony about the Abel test, owing to the test's poor reputation for reliability in the scientific community and the witness's admitted inability to analyze the test results. Cross-examination would be thwarted by Dr. Flores's inability to explain how Fortin responded to the photo display and what this signifies.  The process of analyzing responses is closely-guarded proprietary information that Dr. Abel refuses to share. Admitting the results of Fortin's Abel test would invite the jury to infer that Fortin did not molest the victims:  despite its scientific name—the "Sexual Interest Assessment"— the test is not designed to determine if an accused committed a sex crime against children.

The Abel test is not the type of "professionally reasonable 'matter'" that our Supreme Court has identified as providing a solid underpinning for expert opinion.  (*People v. Stoll, supra,* 49 Cal.3d at p. 1140.)  In effect and in fact Dr. Flores would simply be a surrogate for Dr. Abel, instead of providing his "'*individual interpretation*' of the test."  (*Id.* at p. 1149.) California courts have long "deferred to a qualified expert's decision to rely on 'standardized' psychological tests . . . to reach an opinion on mental state at the time acts were committed.

13

[Citations.]" (*Id.* at p. 1154.) Deference is not appropriate when the expert relies on the Abel test. When expert evidence is excluded because it fails to meet foundational requirements, no federal constitutional violation occurs. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175-1176.)

### [[2. Admissibility of CSAAS Testimony

During Vanessa's cross-examination, defense counsel asked why she did not immediately disclose the sexual abuse to her mother, or report Fortin to a teacher or school counselor, because she understood that the touching was bad and no one should do that to her. The defense similarly questioned Kimberly about her failure to confide in trusted adults about the molestations.

After the victims testified, the prosecutor asked to present expert testimony regarding delayed disclosures of child abuse. Defense counsel objected that the CSAAS applies when children recant, which did not occur here. The court ruled that the testimony is relevant to rebut the common misperception that a delay in reporting abuse signifies fabrication; however, the expert was not allowed to give an opinion as to the facts or witnesses in this case.

Fortin acknowledges that CSAAS expert testimony has been allowed in California criminal trials for three decades. CSAAS testimony may not be used to determine if a child has been abused. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301; *People v. Bowker* (1988) 203 Cal.App.3d 385, 392; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.) It may be used to explain reporting delays owing to a secretive environment created by an abuser who is known to the child. The testimony dispels misconceptions the jury may hold about seeming

14

inexplicable—yet common—reactions children have to being molested. (*Bowker* at pp. 393-394; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 734-735.) "It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation" or inconsistent statements. (*Patino* at pp. 1744-1745; *McAlpin* at pp. 1300-1301; *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117; *People v. Brown* (2004) 33 Cal.4th 892, 905-906 [expert testimony about the behavior of crime victims assists the trier of fact because it is beyond common experience].)

The predicate for Dr. Jones's testimony was the defense's cross-examination of the complaining witnesses, questioning their failure to promptly report the molestations to their parents, teachers or counselors, or give fully detailed reports to the police. The defense attack on the credibility of the witnesses opened the door to rebuttal evidence admitted solely for the purpose of showing that the victims' behavior was not inconsistent with the type of reactions children may have to being molested. Dr. Jones emphasized to the jury that CSAAS "doesn't tell us who has been abused." The point was underscored by an appropriate jury instruction limiting use of the testimony.[4] We

---

[4] "You have heard testimony from Dr. Jayme Jones regarding child sexual abuse accommodation syndrome. [¶] Dr. Jones's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Kimberly['s] and Vanessa's conduct was not inconsistent with the conduct of someone who has been molested in evaluating the believability of her testimony." (CALCRIM No. 1193)

15

must presume that the jurors followed the instruction. (*People v. Romero and Self, supra,* 62 Cal.4th at p. 28.)

Despite the considerable authority authorizing the use of CSAAS in California, Fortin argues that expert testimony about CSAAS should be inadmissible for all purposes. He contends that the testimony serves to suggest that the victim's behavior coincides with that of other sexually abused children, and can be misconstrued as corroboration. Challenges similar to the one Fortin makes here have been rejected because use of a limiting instruction obviates the risk that the jury will believe that the expert is there to corroborate the child's claim of abuse. (*People v. Housley* (1992) 6 Cal.App.4th 947, 958-959.)

### 3. Jury Instructions

We apply a de novo standard of review to assess whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

### a. CALCRIM No. 1193

Fortin argues that CALCRIM No. 1193 erroneously instructed the jury that CSAAS expert testimony may be used to assess the credibility of the complaining witnesses. (See fn. 6, *ante*, for the text of the instruction.) The challenged instruction mirrors language cited with approval by the Supreme Court: "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations & fn.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse,

16

and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.  [¶]  The great majority of courts approve such expert rebuttal testimony.' [Citation.]" (*People v. McAlpin, supra,* 63 Cal.3d at pp. 1300-1301.)

The instruction states that the evidence cannot be used to determine whether Fortin committed the crimes, only to assess witness believability and explain their conduct.  The jury was correctly instructed with CALCRIM No. 1193.

### b.  *CALCRIM Nos. 1128 and 250*

Fortin was charged in count 7 with the crime of sexual penetration of Vanessa, a child less than 10 years old. (§ 288.7, subd. (b).)  As to count 7, the jury was instructed with CALCRIM Nos. 250 and 1128.[5]  Fortin did not object to the use of these instructions.  He now contends that the jury was not informed that the offense is a specific intent crime.

Sexual penetration of a child is a specific intent crime.  (*People v. Ngo* (2014) 225 Cal.App.4th 126, 157.)  The statute "specifies the level of intent required for sexual

---

[5] "For you to find a person guilty of the crime[s] in this case of sexual penetration with a child ten years of age or younger as charged in Count 7 . . . that person must not only commit the prohibited act, but must do so with a wrongful intent.  [¶]  A person acts with a wrongful intent when he or she intentionally does a prohibited act.  However, it is not required that he or she intend to break the law.  The act required is explained in the instruction for that crime or allegation."  (CALCRIM No. 250.)

CALCRIM No. 1128 lists the acts that violate section 288.7, as charged in count 7:  1.  Sexual penetration.  2.  When Vanessa was 10 years old or younger.  3.  Defendant was at least 18 years old.  The instruction defines sexual penetration as "penetration, however slight, of the genital or anal opening of the other person . . . for the purpose of sexual abuse, arousal, or gratification."

17

penetration" (*ibid*) by referencing a definition requiring that the act of sexual penetration be committed "for the purpose of sexual arousal, gratification, or abuse." (§§ 288.7, subd. (b), 289, subd. (k)(1); *People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538.) During closing argument, the prosecutor referenced the elements of section 288.7 and, with respect to sexual penetration, emphasized that "[t]he touching was done with the specific intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of that person or the child and there was no other intent."

CALCRIM No. 250 is a general intent instruction that should not be used for the specific intent crime of sexual penetration of a child. (*People v. Ngo, supra,* 225 Cal.App.4th at p. 162 [the correct instruction is CALCRIM No. 251, for specific intent crimes].) Although the trial court erred by instructing the jury with CALCRIM No. 250, the error was harmless because the sexual penetration instruction told the jury it had to find that Fortin committed the penetration "for the purpose of sexual abuse, arousal, or gratification." Any theoretical possibility of confusion was diminished by the prosecutor's closing argument underscoring the specific intent required. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220, disapproved on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

### 4. Sentencing

The prosecution sought consecutive sentences for Fortin's convictions. The court sentenced Fortin to three consecutive terms of 15 years to life for each section 288 lewd conduct violation (counts 3, 4 and 8), plus 15 years to life for sexual penetration in violation of section 288.7 (count 7).

Section 667.61 authorizes consecutive life terms for serious sex offenses. A defendant convicted of violent acts

18

"against more than one victim" must receive a sentence of 15 years to life for each violation. (§ 667.61, subd. (e)(4); *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1305-1308 [defendant properly sentenced to 13 consecutive terms of 15 years to life pursuant to section 667.61 after attacking and raping five adult victims].)

Fortin asks that section 667.61 "be interpreted so that the multiple-victim circumstance can be imposed only once for each crime victim, regardless of whether the crimes were committed on separate occasions. We reject this argument because it contradicts the statute's legislative intent as determined by the usual and ordinary meaning of the words of the enactment. [Citations.]" (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1521-1522.) A qualifying offense committed against more than one victim is considered as severe as other aggravating factors (such as kidnapping or use of a weapon), meriting application of multiple penalties. (*Id.* at p. 1522; *People v. Stewart* (2004) 119 Cal.App.4th 163, 171.)

"[I]n making multiple convictions for violent sex offenses punishable by multiple life sentences, the Legislature was expressing the view that multiple violent sex offenses deserve more severe punishment than a single violent sex offense because of the predatory nature of the perpetrator." (*People v. Murphy* (1998) 65 Cal.App.4th 35, 41.) As a result, "in sentencing a defendant convicted of committing violent sex offenses against different victims on different occasions the one strike law requires the trial court to impose one indeterminate life term per victim per occasion." (*Id.* at p. 38.)

Consecutive sentences are mandatory if the offenses involve separate victims or the same victim on different

19

occasions, as listed in section 667.61, subdivision (c)(1)-(7). (§ 667.61, subd. (i).) Notably, while the mandatory consecutive sentence clause applies to forcible lewd acts against a child (§ 288, subd. (b)), it does *not* apply to lewd acts committed without force (§ 288, subd. (a)). (§ 667.61, subds. (c)(8), (i).) Fortin was convicted of two non-forcible lewd acts and one forcible lewd act.

The trial court had discretion to impose consecutive sentences for the non-forcible lewd act convictions, but it was not compelled to do so. (*People v. Valdez, supra,* 193 Cal.App.4th at p. 1524.) "[N]othing in subdivision (i) [of section 667.61] purports to proscribe the imposition of consecutive one strike sentences for those whose predicate offense was under section 288, subdivision (a). To the contrary, it merely provides a limitation on the *mandatory* imposition of such terms, which by implication leaves the decision to impose consecutive or concurrent terms to the sentencing court's discretion under section 669. [Citation.]" (*Ibid*; *People v. Valenti* (2016) 243 Cal.App.4th 1140, 1178-1179; *People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262-1263.)

In this instance, the sentencing memorandum advised the trial court that consecutive sentences are "mandatory" for both convictions under section 288, subdivision (a).) The court did not give any indication that it was exercising discretion. By comparison, in *People v. Valdez, supra,* 193 Cal.App.4th 1515, the prosecutor argued that consecutive sentences are *not* mandatory and "the court unambiguously indicated that it was exercising its discretion" to impose consecutive terms based on the victims' youth, the defendant's position of trust, and his use of threats and intimidation. Evidentiary support for these findings led the appellate court to

20

uphold the trial court's imposition of consecutive sentences for multiple violations of section 288, subdivision (a).  (*Valdez* at p. 1524.)

Here, "[e]rror occurred because the trial court did not realize it had discretion to impose a concurrent sentence. 'Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing.  [Citations.]  Defendants are entitled to "sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court," and a court that is unaware of its discretionary authority cannot exercise its informed discretion.'  [Citation]."  (*People v. Woodworth* (2016) 245 Cal.App.4th 1473, 1480.)

Finally, Fortin argues that his sentence violates a proscription barring multiple punishments.  (§ 654; *People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1208.)  Section 654 "prohibits multiple punishment for a single physical act that violates different provisions of law."  (*People v. Jones* (2012) 54 Cal.4th 350, 358.)  Fortin committed criminal acts on separate occasions; he is not being subjected to multiple punishments for committing a single act.  "A defendant may not bootstrap himself into section 654 by claiming that a series of divisible acts, each of which had been committed with a separate identifiable intent and objective, composes an 'indivisible transaction.'"  (*People v. Massie* (1967) 66 Cal.2d 899, 908.)  Multiple offenses are not subject to section 654 when "they were separated by considerable periods of time during which reflection was possible."  (*People v. Surdi* (1995) 35 Cal.App.4th 685, 689.)]]

21

## DISPOSITION

The case is remanded to the trial court to resentence Pedro Fortin on counts 3 and 4 only, to exercise its discretion to impose concurrent or consecutive sentences, and to state on the record the reasons for its sentencing choice. In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.


PERREN, J.


We concur:


YEGAN, Acting P. J.


TANGEMAN, J.

22

Raul A. Sahagun, Judge
Superior Court County of Los Angeles
_____


Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Zee Rodriguez, Acting Supervising Deputy Attorney General, Corey J. Robins, Deputy Attorney General, for Plaintiff and Respondent.