******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* JOSE R.*
(SC 20184)

McDonald, D'Auria, Mullins, Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of four counts of sexual assault in the first degree and three counts of risk of injury to a child in connection with the sexual abuse of his daughter, V, the defendant appealed to this court, claiming that the trial court improperly sentenced him to a period of probation on each sexual assault count and that certain improper remarks made by the prosecutor during closing and rebuttal arguments violated his due process right to a fair trial and his right against self-incrimination. The charges stemmed from incidents that began when V was nine years old, in which the defendant engaged in sexual activity with V and showed her pornographic videos, but V did not disclose the abuse until she was eleven years old. The defendant was then interviewed by an investigator from the Department of Children and Families and, on two other occasions, by a detective, M, during which he denied sexually abusing V or showing her pornography. At trial, V testified, inter alia, that the defendant had sexually abused her when she was nine years old, and M testified about her two interviews with the defendant, but there was no physical evidence or eyewitness testimony, and the defendant did not testify. After the jury returned its verdict, the trial court sentenced the defendant to concurrent terms of ten years' incarceration on each count of risk of injury to a child and, on each count of sexual assault in the first degree, to concurrent terms of twenty-five years' incarceration, execution suspended after twenty years, followed by ten years of probation. On the defendant's appeal, *held*:

1. The trial court improperly imposed a sentence that included a period of probation in connection with the defendant's convictions of sexual assault in the first degree, and, accordingly, this court vacated the defendant's sentence and remanded the case to the trial court for resentencing: case law and the plain language of the relevant statutes (§ 53a-29 (a) and (Rev to. 2013) § 53a-70 (b) (3)) established, and the state conceded, that special parole was the only form of supervised release a trial court could impose upon convicting the defendant of the class A felony of sexual assault in the first degree.

2. The defendant could not prevail on his claim that certain remarks made by the prosecutor during closing and rebuttal arguments were improper:
   a. This court declined the defendant's invitation to overrule *State* v. *Payne* (303 Conn. 538), in which this court clarified that a defendant bears the burden of proving that a prosecutorial impropriety deprived him or her of the general due process right to a fair trial, whereas the state bears the burden of proving harmlessness beyond a reasonable doubt when the defendant alleges the violation of a specifically enumerated constitutional right, such as the right against self-incrimination.
   b. The prosecutor did not improperly comment on the defendant's failure to testify in violation of his right against self-incrimination: the prosecutor's various comments contrasting V's in court testimony with the defendant's out-of-court statements to M and the investigator were not improper because they did nothing to draw the jury's attention, either directly or indirectly, to the fact that the defendant did not testify at trial and, instead, merely asked the jury to compare the victim's and the defendant's versions of events and to decide which version was more credible; moreover, the prosecutor did not improperly comment on the defendant's failure to testify by asking the jurors whether there was any reasonable explanation why they should not find V credible, as that remark was a rhetorical device that the prosecutor used to ask the jurors to refer to their knowledge of human nature, and a reasonable jury would have understood that remark to be a commentary on V's veracity rather than the defendant's silence; furthermore, the context of the prosecutor's entire closing argument, and particularly his emphasis on the believability of V's testimony, her performance during cross-examination, and the consistency of her testimony with the evidence adduced at trial, made

it clear that the jury would not have naturally and necessarily considered the prosecutor's isolated comment that the credibility of a party is best determined by how the party performs on cross-examination to be a comment on the defendant's failure to testify.

c. The prosecutor's remarks did not constitute an improper expression of personal opinion regarding the evidence, V's credibility and the defendant's guilt but, rather, were legitimate commentary on the evidence adduced at trial; when viewed in the context of the prosecutor's entire closing argument, his remarks that "the only conclusion" to be drawn is that V testified credibly and that "the only result" is to find the defendant guilty underscored an inference, namely, that V was credible and that the defendant was guilty of the crimes charged, that the jury could have drawn entirely on its own on the basis of the evidence presented at trial, including V's testimony regarding the sexual assaults, the lack of any reliable evidence indicating that she had a motive to lie, and the defendant's contradictory out-of-court statements.

d. There was no merit to the defendant's claim that the prosecutor improperly relied on facts not in evidence when he remarked that the defendant had failed to disclose to the police until his second interview with M that he spent time alone with V at home after school: the record reflected that the defendant made contradictory statements to the police regarding whether he spent time at home alone with V, M's testimony regarding her two interviews with the defendant was ambiguous with respect to whether it was at the first or second interview that the defendant disclosed spending time alone with V, and the prosecutor's remarks regarding the timing of the defendant's disclosure were a permissible commentary that was predicated on M's testimony and the reasonable inferences that could be drawn from it; moreover, defense counsel did not object to the prosecutor's characterization of M's testimony.

Argued October 20, 2020—officially released March 19, 2021**

*Procedural History*

Substitute information charging the defendant with four counts of sexual assault in the first degree and three counts of risk of injury to a child, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *D'Addabbo, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed in part*; *further proceedings*.

*Megan L. Wade*, assigned counsel, with whom were *James P. Sexton*, assigned counsel, and, on the brief, *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Jonathan M. Sousa*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. Following a jury trial, the defendant, Jose R., was convicted of four counts of sexual assault in the first degree in violation of General Statutes (Rev. to 2013) § 53a-70 (a) (2)[1] and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a)[2] for the sexual abuse of his daughter, V. On appeal, the defendant claims that (1) the trial court improperly sentenced him to a period of probation on each count of sexual assault in violation of General Statutes § 53a-29 (a),[3] and (2) the prosecutor made improper remarks during closing argument and rebuttal, which deprived him of his due process right to a fair trial under the fourteenth amendment and his fifth amendment right against self-incrimination. We agree with the defendant's first claim but disagree with his second claim. We therefore reverse the defendant's judgment of conviction only as to the sentence imposed and remand the case to the trial court for resentencing.

The jury reasonably could have found the following facts. The defendant and V's mother, R, were involved in an on-again, off-again romantic relationship for approximately ten years, during which they had two children: V, who was born in March, 2004, and V's younger sister, who was born in 2010. When V was nine years old, she lived in Windsor Locks with her mother, her younger sister, her maternal aunt, her aunt's boyfriend, and her cousin. While school was in session during this time, either V's aunt or the defendant watched V after school for approximately one to two hours in the afternoon until V's mother arrived home from work with her younger sister, who attended daycare during the day.

The sexual abuse of V began when she and the defendant were home alone together after school. The abuse started slowly, with the defendant removing V's shirt and touching her breasts. Eventually, the abuse progressed to digital penetration, penile-vaginal penetration, fellatio and cunnilingus. When V expressed discomfort with the sexual activity, the defendant told her that it was "okay" and "fun." On two occasions, the defendant showed V pornographic videos on her mother's laptop and told her "this is what we should do."

In January, 2014, V developed a cyst on the outside of her vagina, which caused her significant pain and irritation. R examined the cyst and showed it to the defendant. Concerned about the cyst, R brought V to the pediatrician, who referred V to a surgeon. The surgeon removed the cyst in February, 2014. After the surgery, the defendant stopped sexually assaulting V.

Between V's tenth and twelfth birthdays, the defendant married a woman who had her own children, thus forming a new family. The new arrangement caused a period of estrangement during which the defendant did

not see V or her sister. In an effort to reunify her children with their father, R began bringing V and V's sister to therapy.

In December, 2015, when V was eleven years old, R caught V watching pornography on her Kindle tablet (Kindle). This was not the first time that V had engaged in this type of behavior; R twice previously had discovered V watching sexually explicit movies on her Kindle. R was upset, and she grabbed the Kindle away from V and slapped her on the wrist. R asked V why she kept watching sexually inappropriate movies. In response, V disclosed to her mother that the defendant had "touched her and that they would watch inappropriate things." R was devastated, and, after calling her sisters, she notified the police.

The Windsor Locks Police Department and the Department of Children and Families (DCF) conducted a joint investigation into V's allegations. DCF investigator Carmen Karecki interviewed the defendant during the first week of December, 2015. The defendant was very nervous during the interview, and his hands were shaking. The defendant explained that he suffered from depression, kidney dysfunction, and memory problems. The defendant informed Karecki that, when V was nine years old, he would watch her after school, during which time he made sure that she did her homework and bathed. The defendant denied watching pornography with V or accessing pornography on R's computer but admitted that he previously had watched pornographic movies with R on the television.

Dawn Morini, a detective with the Windsor Locks Police Department, also interviewed the defendant, once on December 10, 2015, and a second time on December 22, 2015. During the first interview, the defendant's hands were shaking, and he informed Morini that "he was born like that and that he had depression." The defendant denied sexually abusing V or showing her pornographic movies. The defendant explained that he thought R and V had fabricated the sexual assault allegations out of a desire "to get more child support out of him." Morini asked the defendant "whether he would ever have time alone with [V]," and the defendant "at one point [responded that] he did have time alone with her, and another time he said that he had both children there."

In the second interview, Morini again asked the defendant about his shaking hands, and the defendant explained that "he believed it was Parkinson's disease." At the conclusion of the second interview, the defendant gave Morini the following written statement: "I watched [V] for about an hour to an hour and [one] half. During this time I never watched a pornographic movie with [V]. One time when [V] was about [nine] or [ten] she had a sore/blister on her vagina. Her mother was concerned and showed me the sore/blister . . .

and I look[ed] at [V's] private area. This was before [V] went to surgery for the problem. I never touched [V] on her private area ever. I never exposed myself or did anything [to V]."

The defendant subsequently was arrested and charged in a seven count amended information with four counts of sexual assault in the first degree in violation of § 53a-70 (a) (2) and three counts of risk of injury to a child in violation of § 53-21 (a). Following a jury trial, at which the defendant did not testify, the jury found the defendant guilty of all seven charges. The trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to twenty-five years of imprisonment, execution suspended after twenty years, and ten years of probation on each count of sexual assault in the first degree and ten years of imprisonment on each count of risk of injury to a child. The sentences were imposed concurrently, for a total effective sentence of twenty-five years of imprisonment, execution suspended after twenty years, and ten years of probation. This appeal followed.

I

The defendant first claims that the trial court improperly sentenced him to ten years of probation on each of his four sexual assault convictions because § 53a-29 (a) permits only a period of probation to be imposed "upon conviction of any crime, *other than a class A felony* . . . ." (Emphasis added.) The state concedes that "the defendant's sentences on [the sexual assault] counts . . . are illegal because they contain probationary terms." We agree.

The defendant did not preserve his claim of sentencing error in the trial court, but we may review the defendant's claim on direct appeal in light of the state's concession that the defendant's sentence is illegal. See *State* v. *Victor O.*, 301 Conn. 163, 193, 20 A.3d 669 (reviewing unpreserved claim of illegal sentence on direct appeal because state conceded that sentence was illegal), cert. denied, 565 U.S. 1039, 132 S. Ct. 583, 181 L. Ed. 2d 429 (2011).[4] As in the present case, the defendant in *Victor O.* was convicted of the class A felony of sexual assault in the first degree under a prior revision of § 53a-70 and sentenced to a term of imprisonment followed by a period of probation. Id., 165, 193; see General Statutes (Rev. to 2003) § 53a-70 (b) (2). The state conceded that the sentence imposed by the trial court was illegal on the ground that "probation was not an authorized sentence because the defendant had been convicted of a class A felony." *State* v. *Victor O.*, 320 Conn. 239, 248 n.9, 128 A.3d 940 (2016); see General Statutes § 53a-29 (a) ("[t]he court may sentence a person to a period of probation upon conviction of any crime, other than a class A felony"); see also General Statutes (Rev. to 2013) § 53a-70 (b) (3) ("[a]ny person found guilty under this section shall be sentenced to a

term of imprisonment and a period of special parole pursuant to subsection (b) of section 53a-28 which together constitute a sentence of at least ten years"). We agreed and, therefore, remanded the case to the trial court for resentencing. See *State* v. *Victor O.*, supra, 301 Conn. 193–94; see also *State* v. *Victor O.*, supra, 320 Conn. 248 n.9 (clarifying that, in *State* v. *Victor O.*, supra, 301 Conn. 163, this court held that "special parole was the only form of supervised release that could be imposed" for conviction of class A felony under §§ 53a-29 (a) and 53a-70 (b) (3)).

Pursuant to the authority established in *State* v. *Victor O.*, supra, 301 Conn. 163, the plain language of §§ 53a-29 (a) and 53a-70 (b) (3),[5] and the state's concession, we conclude that the trial court improperly imposed a period of probation on each of the defendant's four sexual assault convictions. Accordingly, we vacate the defendant's sentence and remand this case to the trial court for resentencing. See, e.g., *State* v. *LaFleur*, 307 Conn. 115, 164, 51 A.3d 1048 (2012) ("Pursuant to [the aggregate package] theory, we must vacate a sentence in its entirety when we invalidate any part of the total sentence. On remand, the resentencing court may reconstruct the sentencing package or, alternatively, leave the sentence for the remaining valid conviction or convictions intact." (Internal quotation marks omitted.)).

## II

The defendant next claims that the prosecutor violated his fifth amendment right against self-incrimination and his fourteenth amendment right to a fair trial by making improper remarks during closing argument and rebuttal.[6] Specifically, the defendant contends that the prosecutor improperly (1) commented indirectly on the defendant's failure to testify at trial, (2) expressed his personal opinion on the strength of the evidence, the credibility of V, and the defendant's guilt, and (3) relied on facts not in evidence. The state responds that the prosecutor's remarks were not improper and that, even if they were, any impropriety was harmless. We conclude that the defendant has failed to establish that the prosecutor's challenged remarks were improper.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant" of a constitutionally protected right. (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560, 34 A.3d 370 (2012). In *Payne*, we clarified that the standard governing a prosecutorial impropriety claim depends on the nature of the constitutional right allegedly violated. "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of

his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." Id., 562–63. "On the other hand . . . if the defendant raises a claim that the prosecutorial improprieties infringed a specifically enumerated constitutional right, such as the fifth amendment right to remain silent or the sixth amendment right to confront one's accusers, and the defendant meets his burden of establishing the constitutional violation, the burden is then on the state to prove that the impropriety was harmless beyond a reasonable doubt." Id., 563.

As an initial matter, the defendant asks us to revisit and overrule *Payne*. He first argues that that there is no legitimate distinction between prosecutorial impropriety claims implicating general due process rights and those implicating specifically enumerated rights. Second, and alternatively, he contends that, even if such a distinction exists, *Payne*'s burden shifting framework improperly collapses the two step analytical process governing our review. We disagree with both arguments. As we explained in *Payne*, the different "allocation of the burden is appropriate because, when a defendant raises a general due process claim, there can be no constitutional violation in the absence of harm to the defendant caused by denial of his right to a fair trial. The constitutional analysis and the harm analysis in such cases are one and the same." Id., 563–64; see also *State* v. *LaBrec*, 270 Conn. 548, 562 n.1, 854 A.2d 1 (2004) (*Borden, J.*, concurring) (recognizing that, "if the [constitutional] error was harmless, then the defendant was not deprived of a fair trial," and, "if the defendant was deprived of a fair trial, then the error cannot be considered harmless"). In contrast, when a prosecutor makes improper remarks that violate a defendant's specifically enumerated constitutional rights, the constitutional analysis and the harm analysis are separate and distinct inquiries. See *State* v. *A. M.*, 324 Conn. 190, 204, 152 A.3d 49 (2016) (analyzing separately whether "the prosecutor violated [the defendant's] fifth amendment rights by directly referencing his failure to testify" and "whether the state has proven beyond a reasonable doubt that the violation was harmless"). Regardless of the type of constitutional right at stake, the burden is always on the defendant to show that the prosecutor's impropriety resulted in the violation of a constitutional right. See id., 199; *State* v. *Payne*, supra, 303 Conn. 562–63.

With these principles in mind, we turn to the merits of the defendant's prosecutorial impropriety claims. In the present case, all of the prosecutor's challenged remarks occurred during closing argument and rebuttal. "As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the

course of closing arguments. . . . When making clos-
ing arguments to the jury, [however, counsel] must be
allowed a generous latitude in argument, as the limits
of legitimate argument and fair comment cannot be
determined precisely by rule and line, and something
must be allowed for the zeal of counsel in the heat of
argument. . . . Thus, as the state's advocate, a prose-
cutor may argue the state's case forcefully, [provided
the argument is] fair and based upon the facts in evi-
dence and the reasonable inferences to be drawn there-
from. . . . Moreover, [i]t does not follow . . . that
every use of rhetorical language or device [by the prose-
cutor] is improper. . . . The occasional use of rhetori-
cal devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty
to avoid argument that strays from the evidence or
diverts the jury's attention from the facts of the case.
[The prosecutor] is not only an officer of the court,
like every attorney, but is also a high public officer,
representing the people of the [s]tate, who seek impar-
tial justice for the guilty as much as for the innocent.
. . . By reason of his office, he usually exercises great
influence upon jurors. . . . While the privilege of coun-
sel in addressing the jury should not be too closely
narrowed or unduly hampered, it must never be used
as a license to state, or to comment upon, or to suggest
an inference from, facts not in evidence, or to present
matters [that] the jury ha[s] no right to consider." (Inter-
nal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn.
28, 37–38, 100 A.3d 779 (2014).

A

We begin our analysis with the defendant's claim
that the prosecutor made various remarks that the jury
naturally and necessarily would have construed as an
indirect comment on his failure to testify in violation
of his right against self-incrimination under the fifth
amendment to the United States constitution.[7] "The fifth
amendment prohibits the state from forcing the defen-
dant to be a witness against himself, and . . . this pro-
tection also prohibits prosecutors from commenting at
trial on the defendant's decision not to testify." *State*
v. *A. M.*, supra, 324 Conn. 200. The reason for this
restriction is that "allowing a prosecutor to comment
on the defendant's refusal to testify would be equivalent
to imposing a penalty for exercising his constitutional
right to remain silent."[8] Id.

"Even an indirect remark by the prosecuting attorney
may violate a defendant's privilege against self-incrimi-
nation if it draws the jury's attention to the failure of
the accused to testify." *State* v. *Arline*, 223 Conn. 52,
66, 612 A.2d 755 (1992). "[W]hen it is unclear whether
the prosecutor's comments at issue referred to the
defendant's failure to testify," a reviewing court
"appl[ies] what is known as the naturally and necessar-
ily test" to determine whether a fifth amendment viola-

tion occurred. (Internal quotation marks omitted.) *State* v. *A. M.*, supra, 324 Conn. 201–202. "That test asks whether the language used [by the prosecutor was] manifestly intended to be, or was . . . of such a character that the jury would *naturally and necessarily* take it to be a comment on the failure of the accused to testify." (Emphasis in original; internal quotation marks omitted.) Id., 201. "[I]n applying this test, we must look to the context in which the statement was made in order to determine the manifest intention [that] prompted it and its natural and necessary impact upon the jury." (Internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 293, 811 A.2d 705 (2003).

The defendant first claims that the prosecutor improperly commented on the defendant's failure to testify at trial by contrasting V's in-court testimony with the defendant's out-of-court statements to DCF and the police. Specifically, the defendant contends that the following four remarks, which focused on the defendant's out-of-court statements, impermissibly drew the jury's attention to the fact that he did not testify at trial: (1) "Now, [V] was quizzed on the dates on when things happened and didn't happen. However, the defendant himself didn't even know when [V] had the procedure [to remove the vaginal cyst]. In his written statement— which you'll have—he says she had it sometime between nine and ten. So what's more accurate, his memory of the dates or [V], where she gives you an incident that can be dated by a medical procedure, and she says things stopped at that point?" (2) "And I explained the state's argument is that [V's] testimony was consistent with all the other testimony and that the defendant's statements were consistent with the defendant's own statements." (3) "And, as I said, what evidence, if any, is there that [V's] testimony was contradicted by anybody other than the defendant saying it didn't happen? However, look at the defendant's statements. I'd argue, as I said, not only [were they] contradicted by [V], by [V's] mother and her aunt, [they were] contradicted by [the defendant] himself: I'm not alone with her; I am alone with her . . . ." And (4) "[I]f you go about things appropriately and you focus on the testimony and you focus on [V] and you focus on the corroboration, the problem is, the state would argue, you're going to find her credible and you're going to find [the defendant's] inconsistent statements to DCF and the police not credible, and you're going to convict, so they can't have that so let's have another story altogether."

The jury in this case was presented with evidence of two different and mutually exclusive versions of events—V's in-court testimony that the defendant sexually assaulted her after school when she was nine years old, and the defendant's out-of-court statements that no sexual assaults occurred. There was no physical evidence or eyewitness to corroborate either V's or

the defendant's testimony, and, therefore, the jury was presented with one essential question—whom to believe? See, e.g., *State* v. *Fernando V.*, 331 Conn. 201, 216, 202 A.3d 350 (2019) (in absence of physical evidence and eyewitnesses to corroborate sexual assault, victim's "testimony was the only evidence of the defendant's guilt, and, therefore, [the] case turned largely on whether the jury believed [the victim]" (internal quotation marks omitted)). It was the sole province of the jury to resolve the inconsistencies between V's testimony and the defendant's statements, and to believe all of V's testimony, all of the defendant's statements, or only a part of each. See, e.g., *State* v. *Meehan*, 260 Conn. 372, 381, 796 A.2d 1191 (2002) ("[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony"). In this context, a prosecutor does not commit an impropriety by summarizing the relevant evidence and arguing "that the jury should find the victim credible because of the consistencies in the state's evidence." *State* v. *Ruffin*, 316 Conn. 20, 31, 110 A.3d 1225 (2015). Furthermore, a prosecutor properly may "direct the jury's attention to the alleged weakness of the defendant's version of the incident as set forth in his out-of-court statements"; *State* v. *Haase*, 243 Conn. 324, 337, 702 A.2d 1187 (1997), cert. denied, 523 U.S. 1111, 118 S. Ct. 1685, 140 L. Ed. 2d 822 (1998); and discuss "the weight to be afforded the defendant's [out-of-court] statements . . . ." *State* v. *Correa*, 241 Conn. 322, 360, 696 A.2d 944 (1997); see also *State* v. *Rivera*, 169 Conn. App. 343, 352–54, 150 A.3d 244 (2016) (prosecutor's remarks urging jury to assess defendant's credibility on basis of two out-of-court statements to police were not improper), cert. denied, 324 Conn. 905, 152 A.3d 544 (2017); *State* v. *Rupar*, 86 Conn. App. 641, 652–53, 862 A.2d 352 (2004) (prosecutor's statement that, in sexual assault cases, " 'it's often a victim's word against a defendant's word as to what occurred' " was not improper because it was not "intended as a comment on the defendant's failure to testify"), cert. denied, 273 Conn. 919, 871 A.2d 1030 (2005); *State* v. *Smalls*, 78 Conn. App. 535, 544, 827 A.2d 784 ("[o]ral statements of a defendant introduced through the testimony of witnesses can be a facet of whether the defendant's version of events is to be believed when the defendant has chosen not to testify"), cert. denied, 266 Conn. 931, 837 A.2d 806 (2003).

Absolutely nothing in any of the prosecutor's challenged statements drew the jury's attention, either directly or indirectly, to the fact that the defendant did not testify at trial. The prosecutor merely asked the jury to compare the victim's version of events with the defendant's version of events and to decide for itself which version was more credible. The prosecutor did not suggest by implication or otherwise that the defendant's version was less credible or of a different quality

because it derived from out-of-court statements rather than live, in-court testimony. We therefore conclude that the prosecutor's remarks comparing V's in-court testimony with the defendant's out-of-court statements were not improper.[9]

The defendant next claims that the prosecutor indirectly commented on the defendant's failure to testify by asking questions in closing argument, the answers to which only the defendant could provide. The following additional facts are relevant to this claim. During closing argument, the prosecutor stated that, due to the lack of physical evidence and eyewitnesses, the outcome of this case should be "decided on two things: credibility [and] corroboration . . . ." With respect to credibility, the prosecutor asked the jury to consider "who's more credible, [V] or the party who can't even keep straight his medical issues and who he's alone with and who he's not alone with? I'd argue that it's undisputed that what [V] testif[ied] [to], if you find her credible, would meet all the elements of all the charges. So, really, your argument is, is she credible or not? If you don't have a reasonable explanation, then why would you not find her credible?" The prosecutor then addressed the explanation that the defendant had proffered to the police as to why V's allegations were unworthy of belief, namely, because she and R wanted more child support. The prosecutor asked: "How would fabricating a—how would getting a person arrested for sexual assault amount to you getting more child support? It would seem more logical to get you less child support. I don't know. That was never explained by him, how he thought that this was being used—there was never any mention about them shaking him down or we'll recant if you give us more money. That was just he put that out there; they want[ed] more child support from me . . . ."

Our case law makes clear that "a prosecutor is prohibited from asking for explanations [that] only a defendant can provide because such questions are an indirect comment on the defendant's failure to testify." (Internal quotation marks omitted.) *State* v. *Arline*, supra, 223 Conn. 67. To determine whether a prosecutor's request for an explanation is an indirect comment on the defendant's failure to testify, we must closely examine the wording of the rhetorical question and context in which it is used. For example, "[a] comment that the defendant was without a reasonable explanation or had no reasonable explanation to show why he was innocent is not necessarily a comment that the jury would naturally and necessarily interpret as related to the defendant's constitutional and statutory right to decline to testify. A prosecutor also may comment on the failure of a defendant to support his factual theories. . . . [Q]uestions posed in closing arguments, even when answers perhaps could be provided by nontestifying defendants, may, depending on the circumstances, be permissible. If a comment or question logically refers to the relative

merits or weaknesses of the case, rather than naturally and necessarily to the defendant's failure to testify, it passes muster." (Citation omitted; internal quotation marks omitted.) *State* v. *Joseph R. B.*, 173 Conn. App. 518, 536, 164 A.3d 718, cert. denied, 326 Conn. 923, 169 A.3d 234 (2017); see *State* v. *Grant*, 286 Conn. 499, 539, 944 A.2d 947 ("the jury would not necessarily have understood the prosecutor's statement that there was no evidence of an innocent explanation for the presence of the defendant's fingerprint on the tissue box or his DNA on the handkerchief as a comment on the defendant's failure to testify" because "the prosecutor was asking the jury to draw an inference from the defendant's statements, not from his refusal to testify"), cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008); *State* v. *Walker*, 206 Conn. 300, 309, 311, 537 A.2d 1021 (1988) (prosecutor's comment " '[d]id you hear anybody get up and say it was him' " in reference to witness who "defense counsel had stressed . . . had committed the murder" was "not of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify" (emphasis omitted)); *State* v. *Joseph R. B.*, supra, 537 ("The jury would not naturally and necessarily understand the prosecutor's remarks to suggest that testimony from the defendant was the only means by which his rhetorical questions could be answered. Rather, the prosecutor's comments were based on the evidence presented and refer to a lack of explanation in the evidence, other than guilt, for a range of behavior . . . ." (Footnote omitted.)); *State* v. *Jarrett*, 82 Conn. App. 489, 502–503, 845 A.2d 476 (prosecutor's observation that " '[t]here was no explanation why the defendant had [the insurance policy that was seized during the search of the apartment] with his other personal documents' " was not "naturally and necessarily an improper comment on the defendant's failure to testify"), cert. denied, 269 Conn. 911, 852 A.2d 741 (2004).

The prosecutor's questions in the present case did not ask for answers from the defendant or anyone else; instead, they were employed as a rhetorical device asking "the jurors to refer to their knowledge of human nature to ascertain an answer to the question." *State* v. *Harris*, 48 Conn. App. 717, 722, 711 A.2d 769, cert. denied, 245 Conn. 922, 717 A.2d 238 (1998); see id. (prosecutor's rhetorical question " '[w]hy would you do that' " was not improper because it did "not point to the defendant's decision not to testify"); see also *State* v. *O'Brien-Veader*, 318 Conn. 514, 547, 122 A.3d 555 (2015) ("[I]n deciding cases . . . [j]urors are not expected to lay aside matters of common knowledge or their own observations and experiences, but rather, to apply them to the facts as presented to arrive at an intelligent and correct conclusion. . . . Therefore, it is entirely proper for counsel to appeal to [the jurors'] common sense in closing remarks. . . . Our jurispru-

dence permits these statements from the prosecution, if properly presented . . . ." (Internal quotation marks omitted.)); *State* v. *Magnotti*, 198 Conn. 209, 220, 502 A.2d 404 (1985) (prosecutor's rhetorical question asking jurors " '[w]hat about the [d]efense's case?' " was "a comment by the prosecutor on the overall quality of the defendant's evidence" and did not "[call] specific attention to the failure of the accused to testify"). The prosecutor asked the jurors to consider, on the basis of their common knowledge and experience, why V would fabricate a story regarding the sexual assaults and how such a story would result in the payment of additional child support. Because the prosecutor's questions "pertain[ed] to whether the jury should have believed the victim's testimony . . . a reasonable jury would have understood the prosecutor's remarks as a commentary on the victim's veracity, not the defendant's silence." *State* v. *Ruffin*, supra, 316 Conn. 31. We therefore reject the defendant's claim that the prosecutor's rhetorical questions were improper.[10]

The next prosecutorial comment challenged by the defendant causes us somewhat greater concern. The defendant contends that the prosecutor violated his fifth amendment right against self-incrimination by informing the jury that "the true test . . . of a party's credibility is how they do on cross-examination, when they're questioned by the opposing party." The defendant argues that, by focusing on the credibility of *parties* rather than *witnesses*, the prosecutor impermissibly drew the jury's attention to the fact that he did not testify. We are troubled by the prosecutor's remark, given that the term "party" has "a technical legal meaning, referring to those by or against whom a legal suit is brought . . . the party plaintiff or defendant, whether composed of one or more individuals and whether natural or legal persons." (Internal quotation marks omitted.) *State* v. *Salmon*, 250 Conn. 147, 154, 735 A.2d 333 (1999). The parties in the present case are the state and the defendant—neither of whom testified or was subject to cross-examination. This isolated comment, if viewed formalistically and devoid of context, could be construed to mean that the defendant's out-of-court statements were less worthy of belief than V's in-court testimony because they could not be subjected to the "true test" of credibility commended by the prosecutor.

Our concerns are assuaged, however, upon consideration of the context in which the prosecutor's comment was made. Although the prosecutor used the word "party" when emphasizing the efficacy of cross-examination as a tool to assess credibility, the context in which his statement was made leaves no doubt that he was asking the jury to consider the credibility of a witness, and one witness in particular: V. Immediately following the challenged statement, the prosecutor said: "Look at how [V] did [on cross-examination]. Defense [counsel] asked her—or told her you were nine when

you told mom what happened, right, and she said no. How old were you? She said I think I was twelve. You look at her birthday, you look at the day of the report, eleven years and seven months. Either she didn't guess, I think, she didn't say for sure. Once again, question: You had a great relationship with mom. Yes. She's your best friend. No. She didn't go that far. No. You like spending time with your mom. Yes. Back then, even now. She had no problem correcting when she thought things were not accurate, corrected either the defense or the state."

The prosecutor's introductory comment asking the jury to focus on how a "party" handles cross-examination was poorly worded—the prosecutor should have used the word "witness" rather than "party"—but we will not allow that misstatement to obscure the obvious and intended meaning of his argument because he did not attempt to contrast V's performance on cross-examination (and by extension, her credibility) with the defendant's failure to testify. "When reviewing the propriety of a prosecutor's statements, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 9, 124 A.3d 871 (2015). In light of the prosecutor's emphasis on the believability of V's testimony, her performance on the stand during cross-examination, and the consistency of her testimony with the evidence adduced at trial, we construe the prosecutor's statement to refer, albeit imprecisely, to V's credibility. See id., 13–14 ("[B]ecause the prosecutor's comment that the victim 'had' to testify 'because of what that man said and did to her' is ambiguous, we read the remark to refer, albeit imprecisely, to the state's overarching theme: the victim had no motive to lie and the defendant did. The remarks, therefore, were not improper."). Because we cannot say that the prosecutor's statement was "manifestly intended to be, or was . . . of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify"; (emphasis omitted; internal quotation marks omitted) *State* v. *A. M.*, supra, 324 Conn. 201; we conclude that the defendant's fifth amendment right against self-incrimination was not violated.

B

The defendant also claims that the prosecutor made various remarks during closing argument and rebuttal that deprived him of his right to a fair trial in violation of the due process clause of the fourteenth amendment to the United States constitution.[11] Specifically, the defendant argues that the prosecutor impermissibly expressed his personal opinion regarding the evidence, the credibility of V, and the defendant's guilt. The defendant further contends that the prosecutor improperly

relied on facts not in evidence when he argued on multiple occasions that the defendant "failed to disclose until his second police interview that he was ever alone with [V], despite the only evidence on that point indicating that he disclosed this information during the first police interview."

It is well established that a "prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [As we noted previously, the prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and [well established] rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider. . . . [W]hile [the prosecutor] may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . .

"Furthermore, the prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 293–94, 96 A.3d 1199 (2014).

The defendant contends that the prosecutor impermissibly expressed his personal opinion on the merits of the case when, at the end of closing argument, he stated: "I'd argue, if you look at the evidence logically, if you look at the evidence impartially, the only conclusion is that [V] was testifying credibly and that she did prove the case beyond a reasonable doubt." Likewise,

the defendant challenges the prosecutor's summary statement at the end of rebuttal: "And I'd ask you—and I tell you the reason why is because, if you listen to the facts of the case we heard, that was presented, that was testified on, the only result, when you look at the credibility, is [to] find the defendant guilty."

The prosecutor's remarks were not improper expressions of personal opinion. Rather, we take them to be legitimate commentary on the evidence adduced at trial and the reasonable inferences supported by the evidence. "It is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the [jury] might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade [it] to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The [prosecutor] should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 38–39, 975 A.2d 660 (2009).

When viewed in the context of the prosecutor's entire closing argument and rebuttal, it is apparent that the prosecutor was urging the jury to infer, on the basis of the evidence presented at trial—including, but not limited to, V's testimony regarding the sexual assaults, the lack of any reliable evidence indicating that she had a motive to lie, and the defendant's contradictory out-of-court statements—that V was "testifying credibly" and "the defendant was guilty" of the crimes charged. Because the prosecutor's "remarks underscored an inference that the jury could have drawn entirely on its own, based on the evidence presented"; *State* v. *Stevenson*, 269 Conn. 563, 585, 849 A.2d 626 (2004); we perceive no impropriety. See id., 584 (prosecutor's "remark during closing argument describing the defendant's explanation as to how he obtained money to buy drugs as 'totally unbelievable' " was not expression of personal opinion but, rather, "a comment on the evidence presented at trial, and it posited a reasonable inference that the jury itself could have drawn without access to the [prosecutor's] personal knowledge of the case"); see also *State* v. *Ciullo*, supra, 314 Conn. 42 (prosecutor's statements did "not purport to convey [his] *personal opinion* of the credibility of the witnesses; instead, the prosecutor's statements, when placed in the context in which they were made, [were] reasonable inferences the jury could have drawn from the evidence adduced at trial" (emphasis in original)); *State* v. *Long*, supra, 293 Conn. 41 (prosecutor's remarks regarding victim's credibility were not improper expressions of personal opinion but, rather, "were intended to appeal to the jurors' common sense and to elicit a

particular conclusion about the veracity of [the victim's] testimony by inviting the jurors to draw reasonable inferences from the evidence presented to them"); *State* v. *Warholic*, 278 Conn. 354, 370 n.8, 897 A.2d 569 (2006) (prosecutor's comment that " '[t]here's only one explanation in this case that makes sense and as difficult as it is to understand that it happens, it's that the defendant did exactly what he's accused of' " was not personal expression of opinion but, rather, "[a] rhetorical comment" on evidence adduced at trial).

Lastly, we address the defendant's claim that the prosecutor improperly relied on facts not in evidence when he stated on multiple occasions that the defendant failed to disclose to the police until his second interview that he was home alone with V after school. The following facts are relevant to our resolution of this claim. At trial, Detective Morini testified that she and a colleague "interviewed the defendant regarding [V's] allegations" of sexual assault "[t]wo different times." The first interview occurred on December 10, 2015, at which time the defendant denied V's allegations. At a certain point during trial, the following colloquy occurred between the prosecutor and Morini:

"[The Prosecutor]: Now, did you ask him whether he would ever have time alone with [V]?

"[Morini]: Yes, we did.

"[The Prosecutor]: And what did he tell you?

"[Morini]: He said that at one point he did have time alone with her, and another time he said that he had both children there.

"[The Prosecutor]: So he—did he tell you at one point he would  . . .  watch [V] and her sister?

"[Morini]: Yes.

"[The Prosecutor]: So he told you at first he would watch them together?

"[Morini]: Yes.

"[The Prosecutor]: And then he told you that's until [V's] mother got home from work?

"[Morini]: That's correct."

Morini also testified that the defendant's hands were shaking during the interview and that, "[a]t that point," the defendant informed Morini that "he was born like that and that he had depression." The prosecutor asked Morini, "[n]ow, [that was] your first interview with him," to which Morini responded "[t]hat was our first interview. Yes." Morini then described the second interview, which occurred on December 22, 2015, explaining that she inquired again about the defendant's shaking hands, and, this time, the defendant "said he believed it was Parkinson's disease."

The prosecutor highlighted Morini's testimony during

closing argument, pointing out that, when the defendant "[met] with DCF . . . he says he watched [V] after school, and he would make sure she took her shower and did her homework. Then he meets with the police, and he says he watched [V] and her sister after school when he first meets with them. Why when he meets with the police does [he] say I was not alone with [V]? Then they interview him a second time. At that point, he acknowledges the fact he was alone with [V] when watching her." The prosecutor later commented that the defendant "knew what he was saying when he said I watched both kids, oh, wait, I was alone with her. So he goes back for the second interview twelve days later with the police. . . . And now he admits he in fact was alone with [V]." In contrast, in his interview with DCF, the defendant "always admit[ted] he was alone with [V]." The prosecutor encouraged the jury to "look at the defendant's statements" and argued that, "not only [were they] contradicted by [V], by [V's] mother, and her aunt, [they were] contradicted by [the defendant] himself: I'm not alone with her; I am alone with her . . . ."

In response, defense counsel argued that there were no discrepancies in the defendant's prior out-of-court statements to DCF and the police. Defense counsel pointed out that "[the defendant] says he watches both kids, that's true. But he also says he watches [V]. He already said that to DCF: I watch [V] alone. He's not hiding anything here."

During rebuttal, the prosecutor disagreed with defense counsel's characterization of the evidence, arguing that the defendant "admit[ted] he took [V] and watched her off the bus in the second interview with [the] police. The first interview he said he watched her with her sister. Once again, ask why you would not want to acknowledge to the police that you're alone with your daughter if there was no reason that you would be concerned about being alone with your daughter." The prosecutor later remarked: "And when you hear dad didn't hide he was alone with [V] in that first interview, I disagree. And you listened to it, but my recollection of the testimony is when he first met with the police, he said he watched both of them. Then when they reinterview[ed] him, oh, yeah, I actually was alone with her." The prosecutor continued: "He tells the police in the first meeting he's watching two kids. Why would you be concerned about admitting you're alone with [V]?"

The record reflects that the defendant made contradictory statements to the police regarding whether he was home alone with V. Morini testified that, at first, the defendant told her that he watched V and her sister together, but, at "one point," the defendant disclosed that he was alone with V. The parties dispute the "point" at which the defendant's subsequent disclosure

occurred—did the defendant admit to Morini during his first interview that he was home alone with V or did he wait until his second interview? Morini's testimony was ambiguous on this subject and was susceptible of more than one reasonable interpretation. It would have been reasonable and logical for the jury to infer that the defendant's disclosure that he spent time alone with V occurred during the first interview, given Morini's later testimony that "[t]hat was our first interview." It also would have been reasonable, albeit perhaps less logical, for the jury to infer that the defendant's disclosure occurred during the second interview and that Morini's reference to "our first interview" pertained solely to the defendant's contradictory explanations for his shaking hands.

"[A] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 438, 902 A.2d 636 (2006). The prosecutor's remarks regarding the timing of the defendant's disclosure that he was home alone with V were predicated on Morini's testimony and the reasonable inferences that could be drawn therefrom. Indeed, the prosecutor expressly informed the jury that he "disagreed" with defense counsel's characterization of the timing of the defendant's disclosure based on his "recollection of the testimony," to which the jury also had "listened . . . ." Furthermore, defense counsel did not object to the prosecutor's characterization of Morini's testimony, a fact that suggests that he did not perceive the prosecutor's remarks to be improper. See, e.g., *State* v. *Medrano*, 308 Conn. 604, 612, 65 A.3d 503 (2013) ("we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time" (internal quotation marks omitted)).

In light of the ambiguity of the testimony, it would have been preferable for the prosecutor to phrase his argument differently and to say to the jury, for example, "I submit to you that you reasonably may infer, on the basis of Morini's testimony, that the defendant did not inform the police until his second interview that he was home alone with V." We are mindful, however, that, "[w]hen making closing arguments to the jury . . . [counsel] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line . . . ." (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 37. Having reviewed the entire record, it is apparent to us that the prosecutor's remarks, although not phrased in the most artful manner, "invite[d] the jury to draw reasonable inferences from the evidence" and did not "invite sheer speculation

unconnected to [the] evidence." *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002). We therefore conclude that the prosecutor's comments were not improper. See, e.g., *State* v. *Stevenson*, supra, 269 Conn. 586–88 (prosecutor's statement that defendant cooperated with police because " '[h]e figured he was the number one suspect anyway . . . and maybe he would get a better deal in court' " was not improper because it "was based on evidence in the record, and did not amount to mere speculation and baseless conjecture"); *State* v. *Ceballos*, 266 Conn. 364, 400–401, 832 A.2d 14 (2003) ("[w]e conclude that the state's attorney's comment about [the victim's] having suffered from delayed disclosure syndrome was not improper because it was an argument in support of an inference that could be drawn from evidence in the record").

The judgment is reversed only as to the sentence imposed on the four counts of sexual assault in the first degree, the sentence is vacated, and the case is remanded for resentencing; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** March 19, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes (Rev. to 2013) § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . .

"(b) . . . (2) Sexual assault in the first degree is a class A felony if . . . the offense is a violation of subdivision (2) of subsection (a) of this section. Any person found guilty under said subdivision . . . (2) shall be sentenced to a term of imprisonment of which ten years of the sentence imposed may not be suspended or reduced by the court if the victim is under ten years of age or of which five years of the sentence imposed may not be suspended or reduced by the court if the victim is under sixteen years of age.

"(3) Any person found guilty under this section shall be sentenced to a term of imprisonment and a period of special parole pursuant to subsection (b) of section 53a-28 which together constitute a sentence of at least ten years."

Hereinafter, unless otherwise noted, all references to § 53a-70 in this opinion are to the 2013 revision of the statute.

[2] General Statutes § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of (A) a class C felony for a violation of subdivision (1) . . . of this subsection, and (B) a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

We note that § 53a-21 was amended by No. 13-297, § 1, of the 2013 Public Acts and No. 15-205, § 11, of the 2015 Public Acts. Those amendments made

certain changes to the statute that are not relevant to this appeal. For purposes of clarity, we refer to the current revision of the statute.

[3] General Statutes § 53a-29 (a) provides: "The court may sentence a person to a period of probation upon conviction of any crime, other than a class A felony, if it is of the opinion that: (1) Present or extended institutional confinement of the defendant is not necessary for the protection of the public; (2) the defendant is in need of guidance, training or assistance which, in the defendant's case, can be effectively administered through probation supervision; and (3) such disposition is not inconsistent with the ends of justice."

Although § 53a-29 has been amended several times since the defendant's commission of the crimes that formed the basis of his conviction, those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 53a-29 throughout this opinion.

[4] In its appellate brief, the state conceded that the defendant's claim was reviewable for the first time on appeal pursuant to *State* v. *Victor O.*, supra, 301 Conn. 163. Following the completion of briefing, the state submitted a notice of supplemental authority; see Practice Book § 67-10; contending that *Victor O.* is inconsistent with *Cobham* v. *Commissioner of Correction*, 258 Conn. 30, 38 n.13, 779 A.2d 80 (2001). Compare *State* v. *Victor O.*, supra, 301 Conn. 193 n.12 ("this court is authorized to correct an illegal sentence at any time pursuant to Practice Book § 43-22"), with *Cobham* v. *Commissioner of Correction*, supra, 38 n.13 (stating that only trial court can correct illegal sentence at any time under Practice Book § 43-22). Nonetheless, the state argued in its notice of supplemental authority that, "[p]ursuant to *State* v. *Guckian*, 27 Conn. App. 225, 246, 605 A.2d 874 (1992) [(overruled in part on other grounds by *Cobham* v. *Commissioner of Correction*, 258 Conn. 30, 779 A.2d 80 (2001)), aff'd, 226 Conn. 191, 627 A.2d 407 (1993)], illegal sentence claims raised on direct appeal are reviewed for plain error." But see *State* v. *Jin*, 179 Conn. App. 185, 195–96, 179 A.3d 266 (2018) (relying on *Cobham* and declining to review under plain error doctrine illegal sentence claim raised for first time on appeal); *State* v. *Crump*, 145 Conn. App. 749, 766, 75 A.3d 758 (same), cert. denied, 310 Conn. 947, 80 A.3d 906 (2013). The state takes the position that *Cobham* and its progeny do "not change the state's concession in this case that the sentences that the defendant received for each of the four sexual assault convictions are illegal." In light of the state's concession, we need not resolve the alleged inconsistency between *Victor O.* and *Cobham* or determine whether the defendant's claim is reviewable for the first time on appeal under Practice Book § 43-22 or the plain error doctrine. At the very least, it is clear to us that *Victor O.* stands for the proposition that a reviewing court may address unpreserved claims of sentencing error when the state concedes on appeal that the sentence imposed by the trial court is illegal and that the defendant is entitled to sentencing relief.

[5] In 2015, § 53a-70 (b) (3) was amended to provide for the imposition of a period of probation for convictions of sexual assault in the first degree in violation of § 53a-70 (b) (2), notwithstanding the fact that it is a class A felony. See Public Acts 2015, No. 15-211, § 16, codified at General Statutes (Supp. 2016) § 53a-70 (b) (3) ("Any person found guilty under this section shall be sentenced to a term of imprisonment of at least ten years, a portion of which may be suspended, except as provided in subdivisions (1) and (2) of this subsection, or a term of imprisonment and a period of special parole pursuant to subsection (b) of section 53a-28 which together constitute a sentence of at least ten years. *Notwithstanding the provisions of subsection (a) of section 53a-29 and except as otherwise provided in this subsection, a court may suspend a portion of a sentence imposed under this subsection and impose a period of supervised probation pursuant to subsection (f) of section 53a-29.*" (Emphasis added.)). It is undisputed that this statutory amendment is inapplicable to the present case because the defendant's criminal conduct predated its enactment. See *In re Daniel H.*, 237 Conn. 364, 377, 678 A.2d 462 (1996) ("[i]n criminal cases, to determine whether a change in the law applies to a defendant, we generally have applied the law in existence on the date of the offense, regardless of its procedural or substantive nature"); see also *State* v. *Kalil*, 314 Conn. 529, 558, 107 A.3d 343 (2014) (holding that statutory amendments reducing penalty for criminal offenses do not apply retroactively in "the absence of any express language in the provision referring to its retroactive application").

[6] The defendant did not preserve his prosecutorial impropriety claims in the trial court, but, "under settled law, a defendant who fails to preserve

claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) [as modified by *In re Yasiel*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.). *State* v. *Payne*, 303 Conn. 538, 560, 34 A.3d 370 (2012).

[7] The fifth amendment to the United States constitution, which is made applicable to the states through the fourteenth amendment, provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const., amend. V; see also *Griffin* v. *California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965) ("the [f]ifth [a]mendment, in its direct application to the [f]ederal [g]overnment, and in its bearing on the [s]tates by reason of the [f]ourteenth [a]mendment, forbids . . . comment by the prosecution on the accused's silence").

[8] "[General Statutes §] 54-84 (a) also prohibits a prosecutor from commenting on the 'neglect or refusal of an accused party to testify . . . .' " *State* v. *A. M.*, supra, 324 Conn. 200 n.5. We historically have "treated the protections of the statute as being synonymous with those of the fifth amendment." Id., 201 n.5.

[9] Nothing in *State* v. *A. M.*, supra, 324 Conn. 190, is inconsistent with our conclusion. In *A. M.*, the prosecutor "directly and unambiguously called the jury's attention to the defendant's decision not to testify" in violation of the fifth amendment by explicitly commenting on the defendant's failure to take the stand. Id., 201. The state claimed that the constitutional violation was harmless beyond a reasonable doubt, arguing in relevant part that the context of the prosecutor's statements "diluted any impropriety and demonstrated a purpose unrelated to the impropriety, namely, to focus on the statements given by the defendant to the police." Id., 206. We rejected this claim, reasoning that, "[i]n spite of the prosecutor's comments asking the jurors to judge the defendant's credibility by the statements he gave to the police, the jury was instructed by the judge that credibility related to witnesses who testified. Thus, the prosecutor, through her statements on credibility, was reminding the jurors again that the defendant did not testify." Id., 206–207.

Contrary to the defendant's assertion, *A. M.* does not stand for the proposition that a prosecutor's remarks challenging the credibility or believability of a defendant's out-of-court statements, which have been admitted into evidence for the jury's full consideration, are improper. Instead, in *A. M.*, we held simply that the prosecutor's allegedly valid purpose in focusing on the defendant's out-of-court statements combined with the trial court's instruction on credibility were insufficient to render harmless beyond a reasonable doubt the prosecutor's clear violation of the defendant's fifth amendment rights. Accordingly, the defendant's reliance on *A. M.* is misplaced.

[10] In arriving at this conclusion, we construe the prosecutor's statement "[t]hat was never explained by him, how he thought that [V's allegation] was being used . . . [because] they wanted more child support" to refer to the defendant's failure to offer an explanation to the police at the time his out-of-court statement was made. We consider this to be the most reasonable interpretation of the comments in the overall context of the facts as marshaled by the prosecutor in his closing argument. See *State* v. *Elmer G.*, 333 Conn. 176, 194–95, 214 A.3d 852 (2019) ("[i]f a prosecutor's remark is ambiguous, this court should not lightly infer that it is improper" (internal quotation marks omitted)); *State* v. *Rivera*, supra, 169 Conn. App. 353–54 (prosecutor's remark " '[d]oes somebody have a stake when they sit in that chair and testify for you' " was ambiguous and, therefore, could be construed to refer to "the stake that the defendant specifically has when he sits in a chair at the police station and gives his version of events," rather than to defendant's failure to testify).

[11] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const., amend. XIV.